UNITED STATES of America,
Plaintiff-Appellee,

v.

Ricardo Alonza GOMEZ, Antonio Reyes
Espinoza and Gilbert Barnett
Hartman, Defendants-Appellants.

No. 84–2648.

United States Court of Appeals,
Fifth Circuit.

Oct. 8, 1985.
Rehearing and Rehearing En Banc
Denied Nov. 18, 1985.
Dissenting Opinion Nov. 18, 1985.

L. Aron Pena, Edinburg, Tex., for Gomez and Hartman.

J.A. Canales, Nancy M. Simonson, Corpus Christi, Tex., for Antonio Espinoza.

Helen M. Eversberg, U.S. Atty., Jack Frels, Sidney Powell, Asst. U.S. Atty., San Antonio, Tex., Mervyn Hamburg, Atty., U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before RANDALL, DAVIS and HILL, Circuit Judges.

## AMENDED OPINION

W. EUGENE DAVIS, Circuit Judge.

Ricardo Alonza Gomez, Antonio Reyes Espinoza and Gilbert Hartman appeal their convictions for conspiracy to possess with intent to distribute marijuana and aiding and abetting one another in the substantive offense of possession with intent to distribute marijuana. We find the evidence introduced at trial was insufficient to sustain Espinoza's convictions, but affirm the convictions of Gomez and Hartman.

This case had its genesis in a telephone call received by the Texas Department of Public Safety (DPS) on June 5, 1983, in which an anonymous informant conveyed the information contained in the following testimony:

> "This department received information that subjects staying in room 1408 of an unknown hotel in San Antone," and gave the phone number, which turned out to be the Marriott Inn North; that they were driving a stolen van loaded with 2,000 pounds of marijuana scheduled to be moved between seven o'clock and eight o'clock 'this date' which was the 5th of June of 1983, and the marijuana

belonged to a Quintero subject who had forged papers. Said the other subjects were from the Chicago area.

Record, Vol. 4, p. 1–42.

On receiving this tip, Officer Kidd of the DPS proceeded to the San Antonio Marriott and surveyed the parking lot without discovering a stolen van. He was informed by the hotel clerks that rooms 1406 and 1408 were registered to a gentleman named Frank Garcia. One hotel clerk pointed out Espinoza and Gomez to Kidd as two of the individuals accompanying Garcia when he checked into the rooms. The rooms were placed under surveillance for the remainder of the day, but no activity of note was observed.

On the morning of June 6, the anonymous tipster again contacted the DPS, advising them that the promised marijuana transaction would take place that morning at a ranch in Seguin, Texas. The tipster further stated that the owner of the marijuana was from Harlingen, Texas, and apparently gave a phone number for the owner's supposed residence there. Finally, the informant stated that if the individuals in the Marriott rooms were followed they would end up at the place of the drug transaction. In response to this information, the Marriott rooms were once again put under surveillance. At 11:28 a.m., Espinoza emerged from room 1406 and drove an unidentified woman to the airport, where she boarded a plane for Houston and Harlingen, Texas. Espinoza then returned to the hotel, and after making a phone call in the lobby, returned to the room. Later, Gomez moved some luggage from room 1408 to room 1406. Shortly afterwards, Espinoza drove a Ford automobile to a Holiday Inn, picked up Hartman, and returned to the Marriott. At 12:45 all three defendants left the Marriott and returned to the Holiday Inn. Gomez was dropped off at the Holiday Inn; Espinoza and Hartman in the Ford then drove north toward Seguin, Texas. At some point in this journey they were joined by a U-Haul truck or van driven by Gomez.

On arriving in Seguin, Espinoza and Hartman stopped at a Kentucky Fried Chicken establishment, while Gomez drove the U-Haul to a residence in the country outside of Seguin. Officers observed the truck parked next to a metal shed and observed Gomez standing outside the shed and speaking to another individual, but saw nothing actually being loaded or unloaded from the truck. After approximately 30 minutes, Gomez returned to the Kentucky Fried Chicken restaurant, where Hartman took his place behind the wheel of the U-Haul. Hartman then drove east on I–10 in the U-Haul; Gomez and Espinoza drove west in the Ford. A few miles later, at approximately the same time, police stopped both the U-Haul and the Ford.

Officer Kidd testified that on stopping the U-Haul he observed marijuana debris on the tailgate portion of the truck and smelled an odor of marijuana. Hartman signed a consent form allowing a search of the truck, which yielded 1,181 pounds of marijuana and a rental agreement bearing Hartman's name. Back at the Ford, Gomez and Espinoza were detained. After the marijuana was discovered in the U-Haul, they were taken back to that site, where both were searched and a small quantity of marijuana, similar in appearance to that found in the truck, was found in Gomez' boot. The following day, room 1406 at the San Antonio Marriott was searched and various materials, including notebook pages bearing what appeared to be computations of income, expense and profit, were seized.

Espinoza, Gomez and Hartman were first indicted on state charges in 1983, but for reasons not immediately apparent from the record, these charges were ultimately dismissed. In June 1984, a two-count federal indictment was returned charging the three defendants with conspiracy to possess marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846, and aiding and abetting one another in the possession with intent to distribute of marijuana in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

In this appeal, the defendants contend that a number of improprieties in their arrests and joint trial require reversal: (1) their arrests and the searches of their vehicles were without probable cause, and therefore the evidence seized from their persons and the vehicles was improperly admitted; (2) the government's delay in obtaining the federal indictment violated their sixth amendment right to a speedy trial as well as the Speedy Trial Act, 18 U.S.C. § 3161(b); (3) the prejudicial potential of the evidence seized from the Marriott room outweighed its probative value, and it was therefore erroneously admitted; and (4) each defendant challenges the sufficiency of the evidence to sustain his respective conviction.

## I. Fourth Amendment Issues

The only evidence seized from the defendants' vehicles or persons which was introduced at trial was the marijuana found in the U-Haul, the small additional amount found in Gomez' boot, and (apparently) the rental agreement from the U-Haul. The defendants contend that the searches which uncovered this evidence were carried out without the probable cause necessary for an arrest or the reasonable suspicion necessary for a *Terry* stop.[1] We disagree, because the law enforcement agents were aware of sufficient facts to justify a reasonable suspicion that criminal activity was taking place and thus to justify an initial *Terry* stop of both vehicles. After the vehicles were stopped, events unfolded in such a fashion that the arrests and subsequent searches were based on probable cause.

---

**1.** *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The government argues in its brief that not all of the defendants have standing to challenge the constitutionality of the seizure of all of the evidence; for example, Gomez and Espinoza should not be allowed to challenge the search of the truck, which Hartman was driving. Since at least one defendant is entitled to challenge each seizure, and since we ultimately find these challenges to be without merit, we do not find it necessary to reach the standing question.

A valid investigatory stop under *Terry* and its progeny, in simplest terms, requires a reasonable conclusion by the police officer, in light of his experience, that some kind of criminal activity is taking place.[2] Reasonable suspicion must be based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880, 20 L.Ed.2d at 906. Finally, these facts must "be judged against an objective standard: Would the facts available to the officer at the moment of seizure ... 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Id.* at 21–22, 88 S.Ct. at 1879–80, 20 L.Ed.2d at 906.

One of the factual circumstances which may go into the making of a reasonable suspicion is that presented by this case—a tip from an unknown informant of untested reliability. We have held that "a tip from an informant of unknown reliability ordinarily will not create a reasonable suspicion of criminality." *United States v. Kent*, 691 F.2d 1376, 1379 (5th Cir.1982), *cert. denied*, 462 U.S. 1119, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983). Such a tip will often give no indication of the informant's past reliability, nor will it indicate the basis for the informant's information and conclusion that criminal conduct is taking place.[3] The courts of appeals are in general agreement, however, that when the details of an anonymous informant's tip are corroborated by independent investigation, it may give rise to a reasonable suspicion.[4] The degree of corroboration required depends upon the circumstances of the particular case. For example, when an anonymous tip from an untried tipster is corroborated by observation of facts which are actual evidence of criminal activity, the tip may even give rise to *probable cause*[5]—which requires a greater amount of proof than the reasonable suspicion in question here. In order for such a tip to give rise to *reasonable suspicion* corroboration of an adequate number of *innocent* details may suffice.

For example, in *United States v. White*, an anonymous informant stated that a young black man wearing a blue jumpsuit would park an automobile in a certain location, enter another specifically described automobile, drive away, and then return carrying drugs. The apparently innocent details of this trip were verified by police. 648 F.2d at 30–31. The District of Columbia Circuit held that this tip and verification were sufficient to support a reasonable suspicion and thus a *Terry* stop.[6]

---

2. *See, e.g., United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981); *Terry v. Ohio*, 392 U.S. at 30, 88 S.Ct. at 1884, 20 L.Ed.2d at 911; *United States v. Gordon*, 722 F.2d 112, 113–14 (5th Cir.1983).

3. *See United States v. Kent*, 691 F.2d at 1379; *United States v. McLeroy*, 584 F.2d 746 (5th Cir.1978); *United States v. White*, 648 F.2d 29, 41 (D.C.Cir.), *cert. denied*, 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233 (1981). *See also Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

4. · *See, e.g., United States v. Kent*, 691 F.2d at 1380; *United States v. White*, 648 F.2d at 41; *United States v. Andrews*, 600 F.2d 563, 569 (6th Cir.), *cert. denied sub nom. Brooks v. United States*, 444 U.S. 878, 100 S.Ct. 166, 62 L.Ed.2d 108 (1979); *United States v. Sierra-Hernandez*, 581 F.2d 760 (9th Cir.), *cert. denied*, 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978).

5. *See, e.g., United States v. Brand*, 556 F.2d 1312 (5th Cir.1977), *cert. denied*, 434 U.S. 1063, 98 S.Ct. 1237, 55 L.Ed.2d 763 (1978); *United States*

*v. Brennan*, 538 F.2d 711 (5th Cir.1976), *cert. denied*, 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977).

6. *See also United States v. Andrews*, 600 F.2d 563 (6th Cir.), *cert. denied sub nom., Brooks v. United States*, 444 U.S. 878, 100 S.Ct. 166, 62 L.Ed.2d 108 (1979) (name, description, and flight on which individual arrived corroborated, tip also stated drugs would be delivered to known dealer—held sufficient to justify investigative stop); *United States v. Sierra-Hernandez*, 581 F.2d 760 (9th Cir.), *cert. denied*, 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978) (unidentified individual told border patrol agent that a specifically described truck had just loaded with marijuana at a canebrake, agent knew canebrake to have been site of past smuggling activity and found the truck nearby—held sufficient to justify investigatory stop of truck); *United States v. Aldridge*, 719 F.2d 368 (11th Cir.1983) (anonymous tip that suspicious individuals in specifically described automobile were fooling around construction site, in light of description and temporal and spatial proximity to construc-

This circuit's discussion in *United States v. McLeroy* is significant here. In *McLeroy,* an untested and unknown informant stated that "a black and white Chevrolet, 1977 Alabama license tag BMB 023, was parked at 1720 27th Street in Ensley, Alabama ... the Chevrolet was in the possession of McLeroy, had a damaged right side, was possibly a stolen vehicle, and might have been involved in a hit and run accident. In addition, ... McLeroy might be carrying a sawed-off shotgun." 584 F.2d at 747. Officers verified only that a car matching this description was parked at this address, that it was registered to McLeroy, and that the address given was McLeroy's. We held that a *Terry* stop was not justified, because "none of McLeroy's *actions* observed by the police were suspicious." 584 F.2d at 748 (emphasis in original). Since the only information in the tip which was corroborated was "readily available to many persons, ... [t]hat the informant knew these few corroborated facts in no way reasonably suggests that the informant could have known more personal facts about McLeroy, such as whether he was involved in crime." *Id.*

■ In this case, surveillance and independent investigation sufficiently corroborated enough of the critical aspects of the informant's tip to form a sufficient basis for reasonable suspicion of criminal activity, and hence for a valid *Terry* stop of the Ford and the U-Haul. The informant gave specific room numbers at a hotel in San Antonio. Surveillance and independent investigation verified that the individuals occupying these rooms undertook activity which the informant had predicted—a journey to Seguin, Texas. This sort of information about an individual is not the sort readily available to the public, and it is reasonable to infer that an informant having it is sufficiently well-acquainted with the individual to know that he may be involved in criminal activity. On arriving in Seguin, the individuals undertook activity which reeked not only of the strange, but more particularly of a drug purchase.

Thus the defendants' own actions corroborated the tip given in this case. Based on all of these circumstances, the officers were justified in entertaining a reasonable suspicion of criminal activity. As the Supreme Court stated in *United States v. Cortez:*

> The [reasonable suspicion] assessment must be based upon all of the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.... Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as fact finders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

449 U.S. at 418, 101 S.Ct. at 695, 66 L.Ed.2d at 629.

The defendants make two primary contentions to support their conclusion that the stops of their vehicles were not based on a reasonable suspicion—first, that much of the information in the tips was unverifiable or inaccurate, and second, that such of the information as was verified by investigation was as consistent with innocent activity as with criminal activity. With regard to the first of these contentions, while much of the information provided by this informant later proved to be unverifiable, and a smaller portion of the information proved to be simply wrong, the informant was correct in predicting some significant actions of the parties, particularly the journey to Seguin and their subsequent actions there which were consistent with a drug

tion site held sufficient to justify investigative stop).

transaction.[7] With regard to the second contention, simply because certain conduct may be construed as consistent with innocent behavior does not mean that this conduct may not form the basis for reasonable suspicion. In many cases a police officer, familiar with the salient characteristics of a particular type of criminal activity, may be able to "perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer." *Brown v. Texas*, 443 U.S. 47, 52 n. 2, 99 S.Ct. 637, 61 L.Ed.2d 357 (1979).

The defendants also rely on *United States v. DeVita*, 526 F.2d 81 (9th Cir. 1975). *DeVita* is quite distinct from this case. *DeVita* also involved tips from an unknown source, to the effect that DeVita would at some point in the future be transporting some type of drugs from San Diego "possibly to the Pittsburgh area." The tips were separated by some five months. After the tips were received, DeVita was placed under long term surveillance, but the surveillance uncovered no more sinister activity than DeVita collecting cardboard cartons, loading his family and some cartons into a car, and driving down the highway. The Ninth Circuit held that the stop of the vehicle on the highway was not supported by reasonable suspicion. 526 F.2d at 82–83. The tips and the facts uncovered by investigation in this case are much more specific and corroborate one another to a greater degree than those in *DeVita*.

■ Since the initial *Terry* stops of the vehicles were valid, we must next determine whether the searches of the truck and of Gomez were based on probable cause. It is clear from the record that they were. Officer Kidd testified that immediately after stopping the truck he observed marijuana debris on the tailgate. This furnished probable cause for a search of the truck, and this evidence was therefore untainted by any fourth amendment impropriety.[8] According to the district court's findings of

fact at the suppression hearing, Gomez and Espinoza were detained for a few moments, then returned to the truck, where they were arrested and the frisk of Gomez took place. All of this took place within approximately twenty minutes. These findings of fact, based on live testimony, must be accepted unless shown to be clearly erroneous. *E.g., United States v. Maldonado*, 735 F.2d 809, 814 (5th Cir.1984). One of the officers who stopped Gomez and Espinoza testified at trial that he was informed by radio of the discovery of marijuana in the truck prior to returning the two to the U-Haul. The point at which the officers detaining Gomez and Espinoza were informed that marijuana had been found in the truck was the point at which the reasonable suspicion ripened into probable cause to arrest. The brief period of detention between the stop of the Ford and the time that Gomez and Espinoza were returned to the truck was not unreasonable in the circumstances of this case. *See United States v. Sharpe*, —— U.S. ——, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). The marijuana taken from Gomez' boot was therefore untinged by fourth amendment impropriety as well.

## II. Sufficiency of the Evidence

■ Gomez and Hartman argue that there is no evidence which allows an inference that they knew of marijuana in the truck or of any sort of conspiracy to possess the marijuana. We disagree. In evaluating the sufficiency of the evidence to support a conviction, we view the evidence and the inferences to be drawn from it in the light most favorable to the verdict— that is, in the light most favorable to the government's position. *E.g., United States v. Barnes*, 761 F.2d 1026, 1030–31 (5th Cir. 1985). If a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt, the conviction may stand. *Id.* In addition, in a conspiracy case, "[t]he government must show

---

**7.** It is also significant that many of the details of the informant's tip were simply *unverifiable,* not necessarily inaccurate.

**8.** We note that Hartman also gave an apparently valid consent to the search of the truck.

beyond a reasonable doubt that the defendant had the deliberate, knowing, and specific intent to join the conspiracy." *E.g., United States v. Jackson,* 700 F.2d 181, 185 (5th Cir.), *cert. denied,* 464 U.S. 842, 104 S.Ct. 139, 78 L.Ed.2d 132 (1983).

We find that the evidence is sufficient to support the convictions of Gomez and Hartman. In the case of Hartman, his actions in renting and driving the truck, loaded with over a thousand pounds of marijuana, smelling of marijuana and having marijuana debris on the tailgate suffice to allow an inference that he was aware of the presence of the marijuana and was part of a conspiracy. *See United States v. Blessing,* 727 F.2d 353, 356 (5th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 777, 83 L.Ed.2d 773 (1985); *United States v. Del Aguila-Reyes,* 722 F.2d 155, 158 (5th Cir.1983). Likewise, that Gomez drove the truck from San Antonio to the farmhouse and subsequently turned it over to Hartman in the above described condition, in addition to which marijuana similar in appearance to that found in the truck was found in his boot, suffices to allow an inference that he was aware of the presence of the marijuana, had possession of it, and was part of the conspiracy.

In the case of Espinoza, however, the inference of knowledge and participation cannot be made. One of the themes which runs through all of our cases involving conspiracy is that a defendant may not be convicted merely on a showing that he associated with individuals participating in a conspiracy, or by evidence that merely places him in "a climate of activity that reeks of something foul." [9] Examining the facts in this case in the light most favorable to the government, nothing more has been done than to place Espinoza in some very bad company. The key link in the government's evidence that is missing as to Espinoza is that he *knew* drugs were in the truck picked up by Gomez and delivered to Hartman.[10] The government has proven only that Espinoza chauffered Gomez and Hartman, who were involved in a conspiracy, and spent some time in a motel room with these individuals. A reasonable jury simply could not conclude beyond a reasonable doubt from these facts that Espinoza had the required knowledge. Espinoza's convictions must therefore be reversed.

### III. Other Matters

The defendants argue that the government's delay until June 1984 in obtaining the federal indictment violated their right to a speedy trial under the sixth amendment and the provisions of the Federal Speedy Trial Act, 18 U.S.C. § 3161(b). A prior state arrest, however, even if based upon the same operative facts as a subsequent federal accusation, does not trigger the sixth amendment right to a speedy trial. *United States v. Walker,* 710 F.2d

---

9. *United States v. Galvan,* 693 F.2d 417, 419 (5th Cir.1982); *United States v. Jackson,* 700 F.2d at 185 *United States v. Fitzharris,* 633 F.2d 416, 423 (5th Cir.1980), *cert. denied,* 451 U.S. 988, 101 S.Ct. 2325, 68 L.Ed.2d 847 (1981); *United States v. White,* 569 F.2d 263, 268 (5th Cir.), cert. denied, 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 149 (1978).

10. Although not argued by the government, we have considered whether the record would support an inference that Espinoza smelled the marijuana in the U-Haul truck and saw the marijuana debris on the truck's tailgate while it was parked in the Kentucky Fried Chicken parking lot. The officers who had the three defendants under surveillance at the fast food restaurant did not testify that they saw or smelled marijuana in the van while it was in the parking lot. Officer Kidd testified that he saw and smelled the marijuana as he "walked past the vehicle" after the truck was stopped on I–10. Kidd testified that the odor didn't "stand out" and that he "had a little trouble" detecting the odor in the closed van. With respect to Espinoza's opportunity to see or smell the marijuana, all the record indicates is that the truck and Ford automobile were parked in the same parking lot and that Hartman left in the truck "about" the same time Gomez and Espinoza left in the van. The record does not disclose whether Hartman left in the truck before Espinoza walked out of the restaurant to get in the Ford. Even if Espinoza walked from the restaurant to the Ford automobile before the truck departed, how close he got to the truck is not disclosed. We conclude therefore that the record is inadequate to allow a jury to infer that Espinoza was in a position to see or smell the marijuana in the truck.

**550**

1062, 1068–69 (5th Cir.1983), *cert. denied*, 465 U.S. 1005, 104 S.Ct. 995, 79 L.Ed.2d 229 (1984). Neither does a state arrest trigger the provisions of the Federal Speedy Trial Act. *See United States v. Wilson*, 657 F.2d 755, 767 (5th Cir.1981), *cert. denied*, 455 U.S. 951, 102 S.Ct. 1456, 71 L.Ed.2d 667 (1982). We therefore find these contentions to be without merit.

The defendants also argue that their subsequent federal prosecution, after the state charges were abandoned, violates the double jeopardy clause of the fifth amendment and the federal *"Petite* policy." [11] Since the defendants have produced no argument or reasoning indicating why the double jeopardy clause is implicated by their federal prosecution, and since they were in fact never actually brought to trial in the state court, we do not address this issue. With regard to the *Petite* policy, the government assures us that this policy is not implicated in this case, and this assurance suffices for our purposes. *See Fry v. United States*, 569 F.2d 303, 304 (5th Cir.1978).

█ Finally, the defendants contend that the probative value of the material seized from the room at the San Antonio Marriott was outweighed completely by its prejudicial potential, and that its admission therefore requires the reversal of their convictions. Evidentiary rulings of this sort are reviewed only for "clear abuse of discretion." *United States v. McMahon*, 592 F.2d 871, 873 (5th Cir.), *cert. denied*, 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 289 (1979). We find no abuse of discretion here.

The convictions of defendants Gomez and Hartman are AFFIRMED. The conviction of defendant Espinoza is REVERSED.

ROBERT MADDEN HILL, Circuit Judge, dissenting:

I respectfully dissent from the majority's holding in this case that the evidence is insufficient to support the convictions of Antonio Reyes Espinoza for conspiracy to

possess with intent to distribute marijuana and aiding and abetting one another in the substantive offense of possession with intent to distribute marijuana.

The standard of review in this case is a familiar one. It is set out in *United States v. Jackson*, 700 F.2d 181, 184–85 (5th Cir. 1983), as follows:

We must, of course, give deference to the findings of the jury. *United States v. White*, 5 Cir., 569 F.2d 263, 268, *cert. denied*, 1978, 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 149. We must view the evidence presented in the case and the inferences that may be drawn from it in a light most favorable to the government and ask whether "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell*, 5 Cir.1982, 678 F.2d 547, 549. "We will reverse only if a reasonably minded jury must necessarily have entertained a reasonable doubt of a defendant's guilt." *United States v. Vergara*, 5 Cir.1982, 687 F.2d 57, 60; *see also United States v. Galvin*, 5 Cir.1982, 693 F.2d 417, 419. Nevertheless, we must not hesitate to overturn a jury verdict when it is necessary to "guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." *Estelle v. Williams*, 1976, 425 U.S. 501, 503, 96 S.Ct. 1691, 1693, 48 L.Ed.2d 126, 130. Juries must not be allowed to convict on mere suspicion and innuendo. *United States v. Littrell*, 5 Cir.1978, [574] F.2d 828, 833. The test is whether the jury "could reasonably, logically, and legally infer from the evidence presented that the appellant was guilty beyond a reasonable doubt." *United States v. White*, 569 F.2d at 266.

In drug conspiracy cases, the government must prove beyond a reasonable doubt that a conspiracy existed, that the accused knew of the conspiracy, and that

11. The *Petite* policy is an internal Department of Justice guideline barring a federal prosecution following a state prosecution for the same acts, except in certain limited circumstances. *See Rinaldi v. United States*, 434 U.S. 22, 25 n. 5, 98 S.Ct. 81, 54 L.Ed.2d 207 (1972).

he knowingly and voluntarily joined it.[1] *United States v. Bright,* 5 Cir.1978, 550 F.2d 240, 242; *United States v. White,* 569 F.2d at 267. We have previously stressed that we will not lightly infer a defendant's knowledge and acquiescence in a conspiracy. *Id.* at 267; *United States v. Johnson,* 5 Cir., 439 F.2d 885, 888, *cert. denied,* 1971, 404 U.S. 880, 92 S.Ct. 213, 30 L.Ed.2d 161. The government must show beyond a reasonably doubt that the defendant had the deliberate, knowing, and specific intent to join the conspiracy. *United States v. Galvan,* 693 F.2d at 419; *United States v. DeSimone,* 5 Cir.1981, 660 F.2d 532, 537, *cert. denied sub nom. Butler v. United States,* 1982, 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149. A showing that the defendant merely associated with those participating in a conspiracy is insufficient. *United States v. Fitzharris,* 5 Cir.1980, 633 F.2d 416, 423, *cert. denied,* 1981, 451 U.S. 988, 101 S.Ct. 2325, 68 L.Ed.2d 847; *United States v. Littrell,* 574 F.2d at 833; *United States v. White,* 569 F.2d at 268. Similarly, the government cannot prove a conspiracy by presenting evidence that only places the defendant in "a climate of activity that reeks of something foul." *United States v. Galvan,* 693 F.2d at 419; *United States v. DeSimone,* 660 F.2d at 537.

In order to apply the above standard to this case, I feel compelled to repeat the facts set out in the majority opinion as they relate to Espinoza's conduct and at the same time add thereto some other facts dealing with Espinoza's involvement in the charges in this case that I have deduced from a reading of the record.

The facts in this case as they relate to the role played by Espinoza are as follows:

On June 3rd, 1983, Espinoza, defendant Ricardo Alonza Gomez and Juan Frank Garcia checked into the Marriott Hotel in San Antonio; Garcia registered for rooms 1406 and 1408. At the time Garcia was wearing some expensive gold jewelry and a watch. On June 6th at 11:28 a.m. Espinoza left room 1406 accompanied by an unidentified Hispanic female and drove her in a 1981 Ford to the San Antonio Airport. At the airport the female boarded an airplane destined for Harlingen, Texas, via Houston, Texas. About noon Espinoza returned to the Marriott Hotel. He entered the lobby and made a telephone call.[2] He then returned to room 1406.

Shortly thereafter the defendant Gomez removed some luggage from room 1408 to room 1406. At about this time the group checked out of room 1408. At 12:15 p.m. Espinoza left room 1406 and drove the Ford automobile from the Marriott Hotel to a Holiday Inn Hotel located a short distance away. He met defendant Gilbert Barnett Hartman who entered the Ford automobile and was driven by Espinoza back to he Marriott Hotel; Espinoza and Hartman then entered the Marriott Hotel. At 12:45 p.m. Espinoza, Gomez and Hartman left the Marriott Hotel. They traveled in the Ford automobile to a place to fuel the Ford; they then drove to the Holiday Inn. Gomez exited the Ford, whereupon Espinoza and Hartman, with Espinoza still driving, proceeded in an easterly direction out of San Antonio towards Seguin, Texas. During the course of this trip they rendezvoused with a U-Haul truck being driven by Gomez; the Ford and the truck then proceeded together. After traveling approximately forty miles, the two vehicles reached Seguin. Espinoza and Hartman stopped at a Kentucky Fried Chicken res-

---

1. Unlike some criminal conspiracies, proof of an overt act in furtherance of a conspiracy is not necessary to establish a conspiracy in violation of the Drug Control Act, 21 U.S.C. §§ 841 & 846 (1976). *United States v. Kupper,* 5 Cir.1982, 693 F.2d 1129, 1134; *United States v. Brown,* 5 Cir.1982, 692 F.2d 345, 348; *United States v. Rodriguez,* 5 Cir. 612 F.2d 906, 919 n. 37, *cert. denied sub nom. Albernaz v. United States,* 1980, 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41.

2. A government agent testified at a suppression hearing that he overheard Espinoza state in this telephone conversation that the "deal" would take place at approximately 1:30 p.m. This testimony, however, was not offered in the government's case in chief at the trial of these defendants.

taurant; Gomez continued on to a rural area and parked his truck next to a metal shed adjoining a rural residence. After about one-half hour, at 3:15 p.m., Gomez drove the truck to the Kentucky Fried Chicken restaurant where he met Espinoza and Hartman.

The three parties visited with each other for a few moments and they then walked out to the parking lot where the truck was located. Hartman entered the truck and drove it in an easterly direction toward Houston. Espinoza and Gomez entered the Ford automobile, with Espinoza again driving, and they proceeded in a westerly direction towards San Antonio. Shortly after the truck left Seguin it was stopped by law enforcement officials and Hartman was placed under arrest. The officers observed marijuana on the back tailgate of the truck and also detected the odor of marijuana being emitted from the truck. The truck was searched and 1181 pounds of marijuana was found. At about the same time Espinoza and Gomez were stopped by law enforcement officials and were placed under arrest. A small amount of marijuana was found in Gomez's boot when he was searched.

On June 7th room 1406 was checked out of and the bill for both rooms, amounting to $729.92, was paid in cash. Also, on June 7th a search warrant was executed on room 1406. The search of this room, in addition to disclosing some personal clothing and gold jewelry, disclosed hotel stationary from the Holiday Inn and notes on graph paper consisting of figures that converted kilograms to pounds, multiplied pounds by dollars, subtracted expenses, and left a net profit figure. The notes also contained words written in Spanish and "Tex-Mex." Also found was a Texas map and a drawn map of an area near Houston. Expert testimony offered by the government was to the effect that the figures and information contained in these notes related to four drug transactions, one of which was consistent with a twelve hundred pound transaction involving marijuana like that involved in this case. The expert further testified that the notes were prepared while the parties involved in the transaction were negotiating the sale of marijuana.

I am compelled to conclude that this evidence was sufficient to support the conviction of Espinoza. The evidence would permit the jury to find or reasonably infer that Garcia, Espinoza and Gomez possessed marijuana which was sold to Hartman and that the negotiations for the sale of the marijuana took place in room 1406 at the Marriott Hotel, which had been occupied by Espinoza. Additionally, it was well within the jury's prerogative based on the evidence to conclude that the use of Espinoza's 1981 Ford automobile was essential to the marijuana transaction. His motor vehicle in fact operated as a life line through out this transaction, tying the parties and the places together in their negotiations and in the ultimate transfer of the marijuana to Hartman in Seguin.

Espinoza's role has to be classified as more than that of a bystander. He drove from the Marriott Hotel to the Holiday Inn, picked up Hartman, transported him back to the Marriott, and then transported Gomez and Hartman back to the Holiday Inn. He then drove Hartman to Seguin, and after the delivery of the marijuana to Hartman, he began to drive Gomez back to San Antonio.

Additionally the evidence found in room 1406 was significant in connecting Espinoza with the other parties in this scheme and revealing his knowledge of this conspiracy. The government's evidence as to the notes found in room 1406 and the expert witnesses' interpretation of those notes as involving a drug deal of approximately the same amount of marijuana involved in this case would reasonably permit a jury to draw the conclusion that a drug transaction was discussed in Espinoza's room. The map of the Houston area also tied into the overall events as this was the direction Hartman was headed after he took possession of the truck loaded with marijuana. The argument by Espinoza that the notes could have been those of other persons later occupying room 1406 after he abandoned it is rebut-

ted by the fact that Spanish and "Tex-Mex" words were present on the notes and that the jewelry found in the room was similar to that worn by Garcia when he checked into the Marriott Hotel on June 3rd.

Further, the conduct of the parties upon their arrival in Seguin is itself indicative of a drug transaction. Immediately upon arrival Gomez in the truck parted company from Espinoza and Hartman in the Ford automobile, only to return a short time later. The truck was then delivered to Hartman. Espinoza's proximity on the same parking lot where the truck was located, the presence of marijuana on the tailgate of the truck, and the odor of marijuana, along with the earlier attendant circumstances, would reasonably support a jury's conclusion that a drug transaction had been accomplished. The majority in its opinion discussing the merits of the fourth amendment issues acknowledges this. The opinion states: "[o]n arriving in Seguin, the individuals undertook activity which reeked not only of the strange but more particularly of a drug purchase." At 547.

The majority's emphasis on the lack of evidence that Espinoza actually *"knew* drugs were in the truck picked up by Gomez and delivered to Hartman," at 549, too narrowly restricts the burden on the government in this case. Espinoza's conviction can be sustained even if he never actually knew that the truck contained marijuana. All that the government had to prove was that there existed an agreement by other parties for the unlawful purpose to possess marijuana with intent to distribute, that Espinoza knew of the agreement and its unlawful purpose, and that Espinoza knowingly and voluntarily joined the agreement. *United States v. Alvarez*, 625 F.2d 1196, 1198 (5th Cir.1980) (en banc); *United States v. Jackson*, 700 F.2d 181, 185 (5th Cir.), *cert. denied*, 464 U.S. 842, 104 S.Ct. 139, 78 L.Ed.2d 132 (1983). It need not be proved that Espinoza knew all of the details of the conspiracy or each of its members, or that he participated in every phase of the criminal venture. *United States v. Grassi*, 616 F.2d 1295, 1303 (5th Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct.

363, 66 L.Ed.2d 220 (1980). Espinoza's role, as well, in the conspiracy could have been a minor one. *United States v. Aguirre Aguirre*, 716 F.2d 293, 297 (5th Cir.1983). Further, it was not a requirement that Espinoza be shown to be present at the time and location of the sale of a controlled substance. *United States v. Parrish*, 736 F.2d 152, 157 (5th Cir.1984); *United States v. James*, 528 F.2d 999, 1012 (5th Cir.), *cert. denied*, 429 U.S. 959, 97 S.Ct. 382, 50 L.Ed.2d 326 (1976); *cf. United States v. Aguirre Aguirre*, 716 F.2d at 298. Thus knowledge by Espinoza of the fact that when the truck was delivered to Hartman in Seguin it contained marijuana was not necessary in order to convict Espinoza. His playing out a chauffeur's role as a member of and in furtherance of the conspiracy, and nothing more, was all that was required to support his conviction.

The facts in this case are akin to those in *United States v. Alvarez*, 625 F.2d 1196 (5th Cir.1980) (en banc). In *Alvarez* the question presented was whether there was sufficient evidence to support the defendant's convictions of a conspiracy to import marijuana. A panel concluded there was not; however, the en banc court held otherwise.

In *Alvarez* the importation of marijuana from a farm in Columbia was discussed by two individuals with undercover agents. The owner of the farm was shown to have spent a night with Alvarez. The next morning Alvarez drove the owner to an airport where they met one of the individuals planning to import the marijuana and who directed them to an airplane to be used in the operation. Alvarez and the farm owner were identified by the importer to the undercover agents as the farm owner and the one who would be present at the off-loading site when the marijuana was flown in from Columbia. Upon being asked by one of the agents if he was going to be at the unloading site, Alvarez nodded affirmatively, smiled, and asked the agent if he was going on the plane. After loading some appliances that had been stored at Alvarez' apartment on to the plane, Al-

varez was arrested. The *Alvarez* court also noted two additional incidents that were significant to Alvarez' involvement in the scheme. A person who had access to the landing field to be used by the plane resided in the same apartment house as did Alvarez; and the landing site was not a likely place for a plane to land and two trees had to be removed to make it so.

In finding that Alvarez' complicity in the drug importation scheme by reason of his knowledge of its unlawful purpose and of the agreement between the parties to accomplish it had been established, the court emphasized these facts: Alvarez' friendship with the Columbian farmer who was the supplier; the farmer's overnight stay with Alvarez in his apartment; the storage of the appliances at the apartment, their transportation in Alvarez' truck, and their being loaded on the plane; the person having access to the landing field resided in Alvarez' apartment; lastly, and critical to the sufficiency of the evidence, Alvarez' and the importer's assurance that Alvarez would be at the off-loading site.

The *Alvarez* court went on to hold that from the overall conduct of the parties in the scheme, it was sufficient to infer that Alvarez knew criminal activity was afoot and that "it must also have been obvious to him that there was conspiracy to import contraband because prior planning and concerted action would be required to load marijuana in Columbia, fly it into this country, and unload it upon its arrival." 625 F.2d at 1198. Alvarez' joinder in the illicit scheme was deemed inferable from evidence that he intended to be at the off-loading site, from which a jury could deduce that his intended presence manifested an agreement to assist in the unloading, and, alternatively, the nodding of his head was an assurance to the agent that he would be present to assist off-loading the plane rapidly.

Like the holding in *Alvarez* that the defendant's intent to be at the off-loading site was a confirmation of an agreement to assist in the unloading of the marijuana from the plane, here, too, Espinoza's crit-

ical role as a chauffeur transporting the parties between the hotels in San Antonio, and then Hartman to Seguin, and Gomez back to San Antonio, supports the reasonable inference that Espinoza was fulfilling a prior agreement to accomplish this unlawful conspiracy.

In addition, knowledge on the part of Espinoza of the scheme and an explanation of the role he played as chauffeur is buttressed by the notes found in the room he occupied at the Marriott Hotel which evidenced this particular drug deal. Like an affirmative nod of the head and a smile, these notes and the story they told would permit a reasonable jury to infer that Espinoza was not innocent of knowledge of "activity which reeked not only of the strange, but more particularly of a drug purchase."

Although mere presence at the scene of illegal conduct is insufficient to support a defendant's conviction of criminal conduct, *United States v. DeSimone*, 660 F.2d 532, 537 (5th Cir.1981), *cert. denied*, 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149 (1982), "a conviction of a criminal conspiracy will be upheld ... when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to him." *United States v. Figueroa*, 720 F.2d 1239, 1246 (11th Cir. 1983) (citations omitted). We have recognized this principle as well. In *United States v. Dean*, 666 F.2d 195, 201 (5th Cir.1982), we held that a conspiracy may be inferred from the concerted action of the parties charged as members. The Supreme Court in *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1972), also gave credence to the proposition that a conspiracy is inferrable from "a development and a collocation of circumstances." *See also United States v. Aguirre Aguirre*, 716 F.2d at 297.

Considering the totality of the circumstances here, to wit, Espinoza's presence with some of the parties for four days, some of this time being spent together in Espinoza's room, the use of Espinoza's

automobile and his chauffeuring the parties during the playing out of their roles in the scheme, his presence when the truck was delivered to Hartman with the undeniable presence of marijuana on the rear area of the truck and the odor of marijuana, coupled with the telltale notes descriptive of this conspiracy found in Espinoza's room, leads inescapably to the conclusion that Espinoza was shown to have been guilty as charged of conspiracy to possess marijuana with intent to distribute and with aiding and abetting his fellow defendants to possess with intent to distribute a quantity of marijuana.

The cases relied upon by Espinoza to show that the government's evidence against him fails to support his conviction are factually distinguishable from this case. In *United States v. Jackson*, 700 F.2d 181 (5th Cir.1983), the court held that the conviction of drug conspiracy of the defendant Whitley lacked support in the evidence. The evidence as it related to Whitley's involvement in the conspiracy simply showed that he joined the presence of two persons in a restaurant who were then involved in a drug transaction. There was no evidence that Whitley knew the nature or purpose of the meeting, or that a large amount of money was then present. Further, although there was evidence Whitley had on several earlier occasions been in the presence of two of the parties to the drug deal, there was no proof that he was ever present when terms of a drug deal were discussed. With this limited involvement, the court held that Whitley had only been shown to have associated with others involved in the conspiracy and that this was insufficient proof to support his conviction of knowingly and voluntarily participating in a conspiracy to possess drugs with intent to distribute. Significant in *Jackson* is the lack of any activity on the part of the defendant in furtherance of the conspiracy, whereas Espinoza played a crucial role in this case.

In *United States v. Longoria,* 569 F.2d 422 (5th Cir.1978), the defendant merely accepted a ride in a vehicle, after which the driver made known the fact that there was marijuana in the vehicle. The defendant thereafter received $300 from the driver along with a request to keep calm as they approached a check point; these facts, coupled with her silence at the checkpoint and with the finding of traces of marijuana in the defendant's handbag, were deemed to be insufficient to implicate the defendant of aiding and abetting possession of marijuana with intent to distribute. Again, there was no showing that the defendant did anything beyond "negative acquiescence," a description which does not describe the activities of Espinoza, an individual who played an "affirmative" role to make this illegal conspiracy succeed.

Also relied upon by Espinoza is *United States v. Blessing,* 727 F.2d 353 (5th Cir. 1984). In *Blessing* the evidence as to the defendant's guilt was that he arrived in town where a drug deal was scheduled with one of the parties to the deal after the party had announced he would arrive with his partner, without specifying the defendant as the partner; they then checked into the same room of a motel; the defendant thereafter rented two vehicles that were used by the coconspirators in a drug transaction; the defendant and the other party checked out of the motel at the time the other party went to deliver some drug purchase money to an undercover agent who was supplying drugs. However, the defendant was never shown to have participated in the negotiations for the sale of the drugs, and had never had any contact with the undercover agent during the crucial period of time the drug deal was effected. Nor was the defendant present during other critical aspects of the transaction. It was shown that the defendant rented the two vehicles because he alone had a credit card and the rental agency required a credit card.

The *Blessing* court held the evidence of the defendant's activities was insufficient to support his conviction for conspiring to possess with intent to distribute a controlled substance. The court stated that it required that something more than placing the defendant "in a 'climate of activity that

reeks of something foul.'" 727 F.2d at 356 (quoting *United States v. Galvan*, 693 F.2d 417, 419 (5th Cir.1982)). Although the court concluded that the defendant's "rental of the van and the car do tend to establish his connection with the conspiracy ... [b]ut with no more than what the government has proven here, renting two vehicles cannot sustain Blessing's conviction." 727 F.2d at 356 (citations omitted). *Blessing* is distinguishable because, first, he had a plausible explanation for his rental of the two vehicles in that he was the only possessor of a required credit card, and, second, he took no other action in furtherance of the charged conspiracy. In contrast, Espinoza also furnished a vehicle that was used in the conspiracy, but in addition he furnished a vehicle, played an affirmative role in furtherance of the scheme to deal in marijuana, and was shown to have the opportunity to be privy to the negotiations regarding the scheme. Thus, *Blessing* fails to support Espinoza's challenge to the sufficiency of the evidence in support of his convictions.

The majority also overlooks the fact that at the time the truck was delivered to Hartman at the restaurant in Seguin there had to be a residue of marijuana on the tailgate area and the truck was emitting an odor of marijuana. It seems reasonable for a jury to infer because of the condition of the truck that Espinoza at this point became aware of the presence of marijuana in the truck, just as the officers who stopped the truck on its way to Houston for the same reasons became aware of the existence of marijuana when they approached the truck.

What has been said regarding the sufficiency of the evidence as to Espinoza's conviction for conspiracy would apply as well to support his conviction for aiding and abetting. The crime of aiding and abetting possession of a controlled substance with intent to distribute does not require a defendant to commit all elements of the underlying substantive offense if he aided and abetted each element; nor is it required that there be proof that he was present at the actual distribution. It only "requires proof of (1) aiding and abetting

the possession and (2) aiding and abetting with intent to distribute." *United States v. Aguirre*, 716 F.2d at 298; *United States v. Pozos*, 697 F.2d 1238, 1242 (5th Cir.1983). Once a conspiracy was established, Espinoza could be found guilty as well of all offenses committed by the parties to the conspiracy in furtherance of the conspiracy while Espinoza was a member of the conspiracy, "as long as the offenses were in the scope of or were a foreseeable consequence of the conspiracy." *United States v. Parrish*, 736 F.2d at 157 (citing *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)).

The evidence in this case as it relates to Espinoza calls for the affirmance of his conviction. Therefore I dissent from the majority's contrary holding.