**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Lloyd Byron LANFORD, a/k/a David Allen Mitchell, Defendant–Appellant.**

**No. 87–1608
Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

Feb. 19, 1988.

William B. Hardie, Jr., El Paso, Tex. (Court-appointed), for defendant-appellant.

LeRoy Morgan Jahn, Asst. U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before GEE, GARWOOD and JONES, Circuit Judges.

GARWOOD, Circuit Judge:

Defendant-appellant Lloyd Byron Lanford (Lanford), who entered a conditional plea of guilty under Fed.R.Crim.P. 11(a)(2), appeals the district court's denial of his motion to suppress evidence seized following his arrest at a permanent Border Patrol checkpoint. We affirm.

**Facts and Proceedings Below**

The United States Border Patrol maintains a permanent checkpoint on Interstate 10, slightly west of Las Cruces, New Mexico, which is itself northwest of and within one or two hours' driving distance from El Paso, Texas. On December 26, 1986, Border Patrol Agent William Jepson (Jepson) was assigned to the Las Cruces checkpoint at the primary inspection area, where westbound vehicles are initially screened. Shortly after 11:00 that morning, he had read a notice posted at the checkpoint that the El Paso, Texas police had broadcast a bulletin warning law enforcement officers to be on the lookout for a suspect in the robbery several hours earlier that morning of the First Financial Banking Center in El Paso. The suspect was described as a white male with a moustache or goatee who was approximately twenty-eight years old; six feet two inches tall; wearing sunglasses, a light colored tee shirt, blue jeans, and a black leather jacket; and driving a dark colored sedan, possibly an Oldsmobile, with the numbers 251 on the license plate. At approximately 12:15 p.m., Lanford, who fit the general description, arrived at the checkpoint in a dark red, almost black 1986 Oldsmobile Toronado that bore Louisiana license plate number 251 D 996.

Jepson questioned Lanford as to his citizenship. Lanford replied that he was an American citizen. Jepson then asked Lanford his destination. Lanford answered, "Nowhere, I'm just driving around." During this exchange, Jepson noticed several facts that together aroused his suspicion. First, Lanford appeared extremely nervous: his hands shook, his voice quivered, and he would barely glance at Jepson, staring straight ahead when answering Jepson's questions. Second, Jepson had noticed that the car bore Louisiana plates and that Lanford, therefore, had driven "quite some distance" to be "just driving around." Third, Lanford was unshaven and generally disheveled. This did not seem to "fit" with the appearance of the car, which was new and well-kept. Based on these observations Jepson directed Lanford to the secondary inspection area for further questioning and used his walkie-talkie to request a computer check of the license plate number to determine whether the car was stolen.

At the secondary inspection area, Jepson asked Lanford for identification. Lanford, who was still seated in the automobile, picked up a wallet from the floorboard and flipped through it but found no identification. Lanford then briefly looked around the automobile's interior and finally presented Jepson with a checkbook containing personalized checks in the name of Chris Lawrence Post. Further questioning revealed that this purported "Mr. Post" could not spell his middle name or give his address consistently with the name and address printed on the checks. His answers were again nervously given. Jepson was then notified that the automobile had been reported stolen. He and Agent Randy Olsen, who came to Jepson's assistance at this time, then arrested Lanford. Less than five minutes had elapsed from the time Lanford had entered the checkpoint.

Then, a contemporaneous search of the car and of Lanford netted over four thou-

sand dollars. Four of the bills seized were later identified as "bait" money given to the robber of the First Financial Banking Center. A black leather jacket and a pair of sunglasses were also discovered during a subsequent search of the car.

Lanford was indicted for (1) robbery of a federally-insured savings and loan in violation of 18 U.S.C. § 2113(a) and (2) interstate transportation of a stolen motor vehicle in violation of 18 U.S.C. § 2312. Lanford filed a pretrial motion to suppress, contending that there was not probable cause for his arrest. After an evidentiary hearing, the district court denied Lanford's motion to suppress. The court held that Lanford lacked standing to challenge the search of the Toronado because he did not have a legitimate expectation of privacy in a stolen automobile. The five-minute detention prior to receiving the report that the automobile was stolen was constitutional, contended the court, because the agents had "a reasonable suspicion, based upon articulable facts, that criminal activity [was] occurring." The court held that the officers had probable cause for arrest once they received the report that the vehicle was stolen. Lanford then moved for a rehearing of his suppression motion on the ground that the government had withheld the names of witnesses to the search of the automobile in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The district court found that their testimony would be immaterial to its decision and denied the motion. Lanford subsequently entered a conditional guilty plea to both counts pursuant to Fed.R.Civ. P. 11(a)(2), reserving the right to appeal the district court's adverse ruling on the suppression motion and to withdraw his plea if successful on appeal.[1]

### Discussion

Lanford argues on appeal that his diversion to the secondary inspection area by

Jepson was unconstitutional because Jepson did not have an articulable, reasonable suspicion of criminal activity and, therefore, that all evidence seized after his arrest must be suppressed. Lanford also reurges his *Brady* complaint.

We begin with the issue of standing. Lanford does not challenge the finding of the district court that he failed to prove that he legally possessed the automobile that Chris Post, the registered owner, had reported stolen. We therefore review only the district court's conclusion of law that Lanford did not have standing to challenge the search of the automobile.

In *United States v. Parks*, 684 F.2d 1078 (5th Cir.1982), we summarized the test for standing under the Fourth Amendment in the wake of the privacy-interest analysis of *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967): " 'whether governmental officials violated any legitimate expectation of privacy held by' the party seeking to exclude the evidence obtained through the challenged search or seizure." 684 F.2d at 1082 (quoting *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633 (1980)). In *Parks*, we held that presence in a plane did not show a legitimate expectation of privacy absent a showing of ownership or proprietary rights. 684 F.2d at 1085-86. Although we have not applied the legitimate-expectation-of-privacy test to a stolen automobile, two other circuits applying this test have denied standing to possessors of stolen automobiles. *See United States v. Hensel*, 672 F.2d 578, 579 (6th Cir.), *cert. denied*, 457 U.S. 1107, 102 S.Ct. 2907, 73 L.Ed.2d 1316 (1982); *United States v. Hargrove*, 647 F.2d 411, 413 (4th Cir.1981). We agree and hold that Lanford lacked standing to challenge the search of the automobile.

Lanford does, of course, have standing to challenge the search of his person.

1. Rule 11(a)(2) requires that the court approve of and the government consent to the conditional plea. The record before us shows the consent of the government but not the approval of the district court. Neither party has raised the issue of the effect, if any, of this omission and nothing in the record suggests that the district court disapproved of Lanford's conditional plea. Under these circumstances, we will consider the merits of Lanford's appeal, but we render no opinion on the effectiveness of a conditional plea that is unapproved of by the district court.

Nevertheless, we believe that Jepson's stop of Lanford was a constitutionally permissible *Terry* stop.[2] *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). *Terry* and its progeny,

> "recognized that a reasonable suspicion of criminal activity based on contemporaneous observations may justify a temporary stop and detention for the purpose of investigating that suspicion, even though the officer does not have probable cause to believe that a particular crime has been committed. Whether a detention is an arrest or merely a *Terry*-stop depends on the 'reasonableness' of the intrusion under all the facts." *United States v. Martinez*, 808 F.2d 1050, 1053 (5th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 1962, 95 L.Ed.2d 533 (1987).

Reasonable suspicion must be based on "specific and articulable facts," not "inarticulate hunches." *Terry*, 88 S.Ct. at 1880. And these facts must "be judged against an objective standard: would the facts available to the officer at the moment of seizure ... 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry*, 88 S.Ct. at 1880. *See United States v. Gomez*, 776 F.2d 542, 546 (5th Cir.1985). *Cf. United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 1877 & n. 6, 64 L.Ed.2d 497 (1980) (objective test determines when seizure of person).

Finally, when making these determinations we must bear in mind our standard of review. When reviewing a trial court's ruling on a motion to suppress, we must accept the trial court's purely factual findings based on live testimony at a suppression hearing unless the findings are clearly erroneous or influenced by an incorrect view of the law. *See United States v. Tarango–Hinojos*, 791 F.2d 1174, 1176 (5th Cir.1986). Moreover, we must view the evidence in the light most favorable to the party prevailing below, except where such a view is either inconsistent with the trial court's findings or is clearly erroneous considering the evidence as a whole. *See United States v. Maldonado*, 735 F.2d 809, 814 (5th Cir.1984).

Following the suppression hearing, the district court found that Jepson had a reasonable suspicion that the car that Lanford was driving was stolen "based upon the following articulable facts: the Defendant's appearance, his nervousness, his bizarre answer to the question concerning his destination, and the fact that the vehicle bore Louisiana license plates." The court concluded that the five-minute detention of Lanford was not unreasonable in these circumstances. Lanford argues that, to the contrary, a finding of reasonable suspicion is based on the erroneous assumption that "nervous, dishevelled nomads from Louisiana are probably engaged in criminal conduct."[3] We disagree.

**2.** We have broadly stated that "at permanent checkpoints, stopping, questioning and referral of motorists to a secondary inspection area are permissible under the Fourth Amendment, even in the absence of any individualized suspicion, much less probable cause." *United States v. Garcia*, 616 F.2d 210, 211 (5th Cir.1980) (citations omitted). Lanford argues that unless Jepson wished to inquire further as to Lanford's citizenship, or perhaps suspected that Lanford was transporting contraband, Jepson could not constitutionally refer Lanford to the secondary inspection area without a "reasonable suspicion based on articulable, objective facts indicating criminality." The district court did not rule on this issue and found that Jepson had a reasonable, articulable suspicion of criminal activity. On appeal, the government simply urges us to affirm on the grounds given by the district court. Because we hold that Jepson made a constitutional *Terry* stop, we need not decide

whether the stop would have been constitutional in light of recent cases such as *United States v. Jackson*, 825 F.2d 853 (5th Cir.1987) (en banc), if the requirements of *Terry* had not been met.

**3.** Lanford's sole contention in respect to the search is that Jepson did not have reasonable suspicion, based on articulable, objective facts indicating criminality, to refer Lanford to secondary inspection. Lanford concedes that such is not required where citizenship or immigration status is in question, but where it is not he asserts there must be reasonable suspicion. However, he does *not* contend (and did not below) that Jepson's referral of him to secondary inspection, despite being satisfied as to citizenship, would have been unlawful *if* Jepson had had such reasonable suspicion (based on articulable, objective facts indicating criminality, albeit not immigration-related); indeed, he

Viewed in the light most favorable to the government, the evidence supports Jepson's less than five-minute detention of Lanford at the secondary detention area. It is important to emphasize that the issue is whether, using an *objective* standard, the facts available to Jepson would give rise to a reasonable *suspicion* of criminal activity. The factors identified by the district court, viewed together, clearly support a reasonable suspicion that the automobile was stolen or that the driver was involved in some other criminal activity. Morover, the evidence shows that Jepson was aware of the El Paso police bulletin but does not clearly indicate whether the bulletin was *subjectively* a *motivating* factor in referring Lanford to the secondary inspection area.[4] The district court did not resolve this factual conflict. Nevertheless, the evidence clearly showed that Jepson was aware of the bulletin and, in light of the factors identified by the district court, had a sufficient objective basis for a reasonable suspicion of criminal activity.

 Finally, we reject Lanford's argument that we must reverse because the government failed to produce the names of witnesses to the search of the automobile as required by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). "A valid *Brady* complaint contains three elements: (1) the prosecution must suppress or withhold evidence, (2) which is favorable, and (3) material to the defense." *United States v. Auten*, 632 F.2d 478, 481 (5th Cir.1980). Here the record does not reflect how their testimony would benefit Lanford. Moreover, because Lanford did not have standing to object to the search of the automobile, the testimony is immaterial. Further, Lanford was, well prior to the suppression hearing, fully as aware of these "witnesses" (though not their names or how to reach them) and what they might have observed as he was when he moved for rehearing; he never requested any information about them from the government; in substance all he asserts is that after he was stopped at the checkpoint he saw them, and thus presumes they saw him and would corroborate his testimony. Lanford in essence merely assumed that the government knew these people were witnesses because it knew they had been at the checkpoint, as one was a Border Patrol detainee and the other a tow-truck driver who had been called by the government to remove Lanford's car. The district court did not err in denying his *Brady* complaint.

### Conclusion

Finding no merit in Lanford's appeal, we affirm the judgment of the district court.

AFFIRMED.

---

concedes (at the very least implicitly) that in those circumstances the referral would be lawful. Consequently, we do not specifically address any possible question in that respect.

4. During the cross-examination of Jepson by Lanford's attorney, the following exchange took place:

"Q. Isn't it a fact that you had no knowledge about this reported robbery and did not use any of that information in detaining Mr. Lanford at the checkpoint?

"A. That's incorrect.

"Q. What is your testimony on that?

"A. As I have stated earlier, I had read the information on the lookout that was given from our radio dispatcher. It was somewhere about the time that the vehicle had been reported stolen to us through our radio dispatcher that I started to place the subject and vehicle description with that of the lookout given.

"Q. So it wasn't at the initial stop of the vehicle that you were formulating any sort of comparison?

"A. That's correct.

"Q. This was later on?

"A. That's correct.

"Q. And isn't it a fact that it was after he was, as you call it, detained that you began to make that comparison?

"A. No, sir.

"Q. You say it was before?

"A. That's correct."