

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-23-2005

# USA v. Pruden

Precedential or Non-Precedential: Precedential

Docket No. 04-1863

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"USA v. Pruden" (2005). *2005 Decisions.* Paper 1497.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1497

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 04-1863

———

UNITED STATES OF AMERICA

v.

CALVIN EDWARD PRUDEN,

*Appellant*

———

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 02-CR-142)
District Judge: Honorable Joseph J. Farnan Jr.

———

Argued: November 18, 2004
Before: ROTH, SMITH, and BECKER, *Circuit Judges*.

(Filed: February 23, 2005)

COLM CONNOLLY
United States Attorney
APRIL M. BYRD (ARGUED)
Assistant United States Attorney
Nemours Building, Suite 700
1007 Orange Street
P.O. Box 2046
Wilmington, Delaware 19899-2046
        *Attorneys for Appellee*

ELENI KOUSOULIS (ARGUED)
Assistant Federal Public Defender
704 King Street, Suite 110
Wilmington, Delaware 19801
    *Attorney for Appellant*

_____

OPINION OF THE COURT

_____

BECKER, *Circuit Judge*.

Calvin Pruden appeals his conviction and sentence for violations of 18 U.S.C. § 922. Pruden argues that a critical statement he made to law enforcement agents was obtained in violation of his *Miranda* rights, because it was given the day after he had been read those rights. He also argues that the District Court erred in requiring, as a condition of his supervised release, that he obtain mental health counseling at the discretion of his probation officer.

We find that Pruden effectively waived his *Miranda* rights. The *Miranda* inquiry here requires us to decide not only whether Pruden knew and understood his rights when they were first read to him, but also whether any intervening event cast any doubt on his ability to consider, fully and intelligently, the effect of exercising or waiving those rights. Although some twenty hours passed between the time that Pruden was read his rights (and made of an earlier statement, which followed a valid *Miranda* waiver) and the questioning that led to his confession, we conclude that Pruden was clearly aware of his rights, and that no intervening events prevented him from making a knowing and intelligent waiver. We therefore affirm Pruden's conviction.

However, we agree with Pruden that the District Court erred in imposing the mental health condition. Conditions on supervised release must be reasonably related to specified statutory purposes, and there is no evidence in the record that links this condition to any of the enumerated purposes. Additionally, the District Court granted Pruden's probation officer the discretion to decide whether Pruden would have to undergo mental health counseling. This was

2

an impermissible delegation of the judicial power: while probation officers may have discretion to decide the details of a defendant's mental health treatment, they may not be given the authority to decide whether or not such treatment will be required. We will therefore vacate this condition on supervised release.

## I. Facts and Procedural History

On two occasions in June 2002, Pruden visited a New Castle, Delaware, gun shop and attempted to purchase a firearm. Pruden had an extensive record of state felony convictions, mainly for drug-related crimes, and was forbidden from possessing firearms. *See* 18 U.S.C. § 922(g)(1). He was also on probation for a drug conspiracy conviction. Apparently to avoid the strictures of § 922(g)(1), Pruden convinced friends to accompany him to the gun shop and make the purchase for him. On the first occasion, Stephanie Crawley filled out an application to buy a gun, but this application was declined for undetermined reasons. Pruden returned two days later with another friend, Tiffany Ash, who successfully purchased a .40 caliber Smith & Wesson pistol with $400 in cash that Pruden had given her. She turned the gun over to him. Pruden, in turn, apparently gave it to still another friend named Willie Andrews, known as "Cheddar." Andrews was also a former felon and therefore a § 922(g)(1) prohibited person. In August 2002, Crawley and Ash were interviewed by agents of the Bureau of Alcohol, Tobacco, and Firearms (ATF); after initial denials, they admitted to the facts set forth above.

Pruden was arrested by ATF agents at a routine meeting with his probation officer on January 14, 2003. He was questioned by ATF Special Agents Jason Kusheba and Veronica Hnat. Before questioning, Agent Kusheba asked Pruden if he was willing to talk, and upon receiving an affirmative answer, read Pruden the *Miranda* warnings. Pruden said that he understood his rights, and did not ask any questions or request a lawyer. Agent Kusheba again asked Pruden if he was willing to answer questions, and Pruden agreed. The agents then questioned Pruden for about half an hour. He admitted that he had gone to the gun shop with Crawley and Ash, and that he had picked up and examined some guns on each occcasion, but he denied that either woman had attempted to buy a gun for him. He claimed instead that they were purchasing for

3

themselves. Agents Kusheba and Hnat then took Pruden to a federal detention center, where he spent the night.

The next morning, January 15, 2003, Kusheba and a different partner drove Pruden from the jail to the courthouse for an initial hearing. Agent Kusheba explained the booking procedures to Pruden, and informed him that the prosecutor planned to ask the magistrate judge to detain him before trial. Kusheba also "indicated to [Pruden] if there was anything he had, additional that he had to say, that now was the time to do it because, once he got to the initial appearance, it would be too late." He then reminded Pruden that he had read him his *Miranda* rights, and asked Pruden if he remembered them as Kusheba had read them. Pruden responded that he remembered his rights, did not ask Kusheba to repeat them, and agreed to answer questions during the ten-minute ride to the courthouse. Pruden admitted that Andrews had asked him for help in obtaining a gun, and that he had asked Ash to go with him to the gun shop to buy a gun for Andrews. Kusheba did not record this conversation.

Pruden was charged with aiding and abetting a straw purchase of a firearm, *see* 18 U.S.C. § 922(a)(6), and being a felon in possession of a firearm, *see* 18 U.S.C. § 922(g)(1). At trial, Ash and Crawley testified about their visits to the gun shop with Pruden, and Kusheba testified to the contents of Pruden's two statements. Pruden timely moved to suppress these statements, claiming that they were not given pursuant to a knowing and voluntary waiver of his *Miranda* rights, but the District Court denied his motion. Pruden did not testify, and the jury convicted him on both counts.

Prior to Pruden's sentencing, the Probation Office prepared a Presentence Report (PSR). The PSR reflects that Pruden has a lengthy record of juvenile and adult convictions, including numerous convictions for loitering and trespass, which the government claims often suggest drug trafficking. The PSR also describes Pruden's difficult childhood. His mother was a cocaine addict who was in prison for most of Pruden's childhood, and he did not meet his father until he was seventeen years old. He was raised by his grandmother, on welfare and with very little supervision, until her death in 1988, when Pruden was about twelve years old. After his grandmother's death, Pruden took to the streets and raised himself, spending large parts of his teen years in

juvenile facilities and completing his GED at one of them.

The PSR does not report any mental health problems. It describes Pruden's mental state as follows:

> According to the defendant, he has never been evaluated or treated for a mental or emotional illness, and to the best of his knowledge no one within his immediate family has ever suffered from mental illness. Record obtained from the Glen Mills School for Boys reflects, the defendant had a psychological evaluation performed on January 22, 1993 [when Pruden was sixteen years old]. The psychologist concluded, Mr. Pruden did not suffer from any mental health deficiencies and was of low average intelligence. Presently, Mr. Pruden reports being in a good frame of mind and not in need of mental health treatment.

Pruden claimed that he used marijuana occasionally, had never used other illegal drugs, and was developing a drinking problem.

The District Court imposed a sentence of 21 months of imprisonment followed by three years of supervised release. This sentence is within the range recommended by the United States Sentencing Guidelines.[1] The sentence included a number of conditions on Pruden's supervised release, one of which requires Pruden to "participate in a mental health treatment program at the discretion of his probation officer." This condition was not recommended in the PSR or requested by the government. The District Court explained at sentencing only that the conditions on supervised release "are put on there for one reason: To give you the help you need when you get back on the street. They're not punitive. They're assistance. I hope you take them that way, sir."

Pruden timely appealed the District Court's denial of his motion to suppress his January 15 statement, and the imposition of the mental health treatment condition on his term of supervised release. We have jurisdiction pursuant to 29 U.S.C. § 1291.

---

[1] Pruden has not appealed the term of imprisonment, so we need not review this aspect of the sentence. *See United States v. Booker*, — U.S. —, 125 S.Ct. 738, 769 (2005).

5

## II. Suppression of Pruden's Confession

Pruden timely objected to the introduction of his statements at trial, and a suppression hearing was held. In an appeal from the denial of a suppression motion, this Court reviews the District Court's factual findings for clear error, and exercises plenary review of the District Court's legal conclusions based on those facts. *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002). The ultimate question of voluntariness of a *Miranda* waiver is subject to plenary review, *cf. Ahmad v. Redman*, 782 F.2d 409, 413 (3d Cir. 1986); *United States v. Martin*, 369 F.3d 1046, 1055 (8th Cir. 2004), although we review the historical facts supporting that conclusion for clear error.

A defendant may waive his *Miranda* rights if the waiver is made knowingly, intelligently, and voluntarily. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Two factors affect this determination:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986).

While Pruden objected at trial to the admission of both his January 14 and January 15 statements, he now concedes, as we think he must, that the January 14 statement was the product of a voluntary *Miranda* waiver. Agent Kusheba read Pruden his rights and asked if he was willing to talk; Pruden said that he understood his rights and agreed to talk. Pruden was familiar with his rights, having been involved in the justice system on numerous previous occasions. *Cf. United States v. Palmer*, 203 F.3d 55, 60 (1st Cir. 2000) ("Because he had a record of sixteen prior arrests, the district

6

court found that Palmer comprehended the significance of a Miranda waiver."). The circumstances of his interrogation do not provide any reason to think that the waiver was involuntary: Pruden was questioned in the probation office, with nothing to indicate coercion or discomfort.

Pruden argues, however, that his (second) January 15 waiver was not knowing, intelligent, and voluntary, because Agent Kusheba did not re-read the *Miranda* rights, but only asked Pruden if he remembered his rights and if he was willing to talk again. *Miranda*, however, does not necessarily require that a suspect be warned anew each time he is questioned. *See, e.g.*, *Guam v. Dela Pena*, 72 F.3d 767, 769-70 (9th Cir. 1995) (finding that a fifteen-hour delay between waiver and statement does not require new warning and waiver).[2]

Instead, the question whether a suspect needs to be warned when questioning resumes boils down to whether the suspect can and does effectively waive his *Miranda* rights at the second questioning. As Judge McClure has aptly put it,

> the question of whether a time lapse renders *Miranda* warnings "stale" may be reduced to answering two questions: (1) At the time the *Miranda* warnings were provided, did the defendant know and understand his rights? (2) Did anything occur between the warnings and the statement, whether the passage of time or other intervening event, which rendered the defendant unable to consider fully and properly the effect of an exercise or waiver of those rights before making a statement to law enforcement officers?

*United States v. Vasquez*, 889 F. Supp. 171, 177 (M.D. Pa. 1995). We now adopt this eminently sensible framework for analyzing the

---

[2]Pruden attempts to distinguish *Dela Pena* by noting that the officers there reviewed Dela Pena's *Miranda* rights before resuming questioning. But in fact Dela Pena disputed this account of events, and the Ninth Circuit disavowed this rationale and held specifically that "it was not necessary to repeat the earlier *Miranda* warnings." 72 F.3d at 769 n.1.

effect of delays between *Miranda* warnings and custodial statements.

The first question is whether Pruden knew and understood his rights at the time the *Miranda* warnings were given on January 14. As explained above, we think that the answer to this question must be yes. The second question is whether the passage of time or an intervening event rendered Pruden unable to effectively waive his *Miranda* rights when he was questioned again the following morning. A significant amount of time passed between the *Miranda* warnings and Pruden's January 15 statement: the record does not reflect the exact amount, but it seems that Pruden was arrested in the afternoon on January 14 and questioned again in the morning of January 15, suggesting a time lapse of perhaps twenty hours. This is longer than the periods involved in *Dela Pena* (fifteen hours) and *Vasquez* (three hours), and does seem to be at the upper end of the permissible range. On the other hand, Agent Kusheba specifically reminded Pruden of his rights before resuming questions, and Pruden responded that he understood his rights, did not ask Kusheba to repeat them, and was willing to answer questions.

Beyond the passage of time, we can find no other relevant event that could have lessened the effectiveness of Pruden's *Miranda* waiver. There are no allegations of mistreatment, intimidation, or deprivation of food or sleep during the intervening detention. On both January 14 and January 15, Pruden was questioned by the same ATF Agent, Kusheba, about the same offenses. The charges were not escalating, *see United States v. Marc*, Crim. No. 96-76-SLR, 1997 WL 129324, *8 (D. Del. 1997) (suppressing statement taken 10 hours after *Miranda* warnings when suspect was arrested and warned for misdemeanor drug possession, but later questioned about felony firearm charges), and there were no surprises that might have confused Pruden. Nor is there any reason to think that the circumstances of the questioning—in a police car on the way to court—were particularly intimidating. Pruden points out that he had "literally no choice but to stay with the agents" during this questioning. That is true, but we cannot see how that fact distinguishes this questioning from any other custodial interrogation.

Finally, Pruden alleges that Agent Kusheba deceived him into waiving his rights by suggesting that he should make a

8

statement before the initial appearance, at which point "it would be too late." Agent Kusheba apparently meant that, if Pruden had nothing else to say before the appearance, the prosecutor would move to have him detained before trial. As this appears to have been true, it is difficult to see how it constitutes deception. Furthermore, there is no evidence that Kusheba's statement coerced Pruden, who unhesitatingly agreed to talk.

The relatively long time between the *Miranda* warnings and the statement at issue, the change of location, the differences between Pruden's January 14 and 15 statements, and the lack of independent corroboration of Pruden's waiver are considerations that might counsel against finding an effective *Miranda* waiver during the January 15 questioning. These factors make this a fairly close case. Ultimately, however, we think that the changed circumstances were not enough to impair Pruden's ability to make a knowing and voluntary *Miranda* waiver. Because Agent Kusheba reminded Pruden of his *Miranda* rights, albeit without repeating those rights in full, and because Pruden plainly remembered the warnings and unhesitatingly agreed to talk, we hold that his statement was made pursuant to an effective *Miranda* waiver, and should not have been suppressed.

### III. The Mental Health Condition at Sentencing

Pruden also appeals a condition that the District Court placed on his three-year term of supervised release, which reads: "The defendant shall participate in a mental health treatment program at the discretion of the probation officer." At sentencing, Pruden did not object to this condition, and we therefore review the sentence for plain error. *See United States v. Evans*, 155 F.3d 245, 248, 251 (3d Cir. 1998); *cf.* Fed. R. Crim. P. 52(b). Appellant bears the burden of proof of establishing plain error. *United States v. Olano*, 507 U.S. 725, 734-35 (1993). *Evans* sets forth the plain error standard:

> There must be an "error" that is "plain" and that affects substantial rights.. The deviation from a legal rule is "error," and an error is "plain" if it is "clear" or "obvious." In most cases, an error affects substantial rights if it is prejudicial, i.e., affected the

outcome of the district court proceedings. When such an error exists, the Court of Appeals has authority to order correction, but is not required to do so. We will exercise our discretion and vacate the sentence if the plain error affecting substantial rights also seriously affects the fairness, integrity, or public reputation of judicial proceedings.

155 F.3d at 251 (some internal quotation marks and citations omitted). Thus, if there is plain error, we *may* correct it, but we *must* correct it only if it seriously impacts the fairness of the judicial system.

## A. Support for the Mental Health Condition

The District Court is limited in its discretion to impose conditions on release by the supervised release statute, which "is not open-textured." *Evans*, 155 F.3d at 248. The statute allows the court to impose a condition upon supervised release to the extent that the condition "is reasonably related" to certain factors set forth in § 3553(a)(1) & (2) and involves no greater deprivation of liberty than is reasonably necessary to achieve the § 3553(a)(2) purposes. *See* 18 U.S.C. § 3583(d). The court must thus consider the following § 3553 factors in setting conditions on supervised release:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
> . . .
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

18 U.S.C.A. § 3553(a). "[I]t is not necessary for all of the factors

10

identified in § 3553(a) to be present before a special condition of supervised release may be imposed . . . ." *United States v. Sicher*, 239 F.3d 289, 291 (3d Cir. 2000).

The § 3553(a) factors are fairly broad, but they do impose a real restriction on the district court's freedom to impose conditions on supervised release. Courts generally cannot impose such a condition—even one with a clearly rehabilitative purpose—without evidence that the condition imposed is "reasonably related," that is, related in a "tangible way," *Evans*, 155 F.3d at 249, to the crime or to something in the defendant's history.

This is not an especially high standard. At the same time, though, it is a standard with teeth: a condition with no basis in the record, or with only the most tenuous basis, will inevitably violate § 3583(d)(2)'s command that such conditions "involve[] no greater deprivation of liberty than is reasonably necessary." To facilitate review, a district court should state on the record its reasons for imposing any such condition. *See United States v. Loy*, 191 F.3d 360, 371 (3d Cir. 1999). Not surprisingly, our sister Courts of Appeal have set aside conditions that had inadequate support in the record, as set forth in the margin.[3]

---

[3] *See, e.g.*, *United States v. T.M.*, 330 F.3d 1235, 1240-41 (9th Cir. 2003) (vacating sex-offender conditions imposed on drug-crime defendant based on twenty-to-forty-year-old sex offenses); *United States v. Modena*, 302 F.3d 626, 636-37 (6th Cir. 2002) (vacating conditions of release requiring drug counseling and alcohol abstinence in the absence of evidence that the defendant had a substance abuse problem); *United States v. Peterson*, 248 F.3d 79 (2d Cir. 2001) (vacating Internet and sex-offender conditions imposed as part of bank larceny sentence because conditions were vague and lacked a reasonable relation to prior incest conviction); *United States v. Scott*, 270 F.3d 632, 636 (8th Cir. 2001) (vacating "special conditions of sex offenders" imposed on a bank robber who had a fifteen-year-old rape conviction, because the sex offender conditions were unrelated to the crime of conviction and there was no evidence of a propensity to commit future sexual offenses); *United States v. Bass*, 121 F.3d 1218, 1224-25 (8th Cir. 1997) (vacating conditions barring defendant, who convicted of selling crack cocaine, from using alcohol, where there was no evidence of that the defendant abused alcohol or that alcohol played a role in the crime); *United States v. Prendergast*, 979 F.2d 1289, 1292-93 (8th Cir. 1992) (vacating

Here, the District Court did not point to any evidence that any of the § 3553(a) factors were present in Pruden's case. As for § 3553(a)(1), neither the "nature and circumstances of the offense," here an attempt to purchase a weapon illegally, nor the "history and characteristics of the defendant," provide any evidence of a need for mental health treatment. The only evidence of Pruden's "history and characteristics" came from the PSR, which tends to show that Pruden has a generally good mental state with no history of mental illness. The PSR does detail a troubling family history, although, as the government itself argued at sentencing, this history is no worse than that of many other criminal defendants. And while Pruden has a long criminal history, this alone cannot demonstrate a need for mental health treatment—for if it did, virtually any repeat offender could be required to undergo such treatment. *Cf. Evans*, 155 F.3d at 249.

Similarly, while a district court may impose conditions on supervised release "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," § 3553(a)(2)(D), we have no indication that there is in fact any *need* for mental health treatment. Again, the PSR does not report any need for mental health treatment. And no one even suggests that the mental health condition serves the preventive or deterrent functions of § 3553(a)(2)(B) or (C).

We are not unappreciative of the good intentions of the District Court, as exemplified by its statement to Pruden that the condition would "give you the help you need when you get back on the street." In its desire to try to convert Pruden into a constructive member of society, the District Court indulged the notion that mental health treatment might help. But such a notion does not satisfy our jurisprudence. Moreover, imposition of a condition of supervised release creates significant costs for the probation system,[4] and can result in sanctions on the defendant for violation

_____

conditions of wire fraud sentence forbidding alcohol and requiring defendant to submit to warrantless drug and alcohol search, where there was no evidence that defendant had drug or alcohol problems).

[4]These costs include paying the professionals who evaluate and treat defendants. According to the National Treatment Database of the

12

of the condition.

Given the complete absence of facts that would indicate a need for this mental health treatment, we cannot find that this condition is "reasonably related" to any of the allowable purposes of conditions on supervised release.

## B. Delegation to the Probation Officer

The condition on supervised release is also invalid because it delegates to Pruden's probation officer the decision whether to require mental health treatment: "The defendant shall participate in a mental health treatment program *at the discretion of the probation officer*."

Probation officers have broad statutory authority to advise and supervise probationers, and to "perform any other duty that the court may designate." 18 U.S.C. § 3603(10). But the breadth of these powers is "limited by the probation officer's status as a nonjudicial officer." *United States v. Kent*, 209 F.3d 1073, 1078 (8th Cir. 2000). The most important limitation is that a probation officer may not decide the nature or extent of the punishment imposed upon a probationer. *Id*.; *see also Ex parte United States*, 242 U.S. 27, 41-42 (1916) ("[U]nder our constitutional system the right to . . . impose the punishment provided by law is judicial . . . .").

This limitation extends not only to the length of a prison term imposed, but also to the conditions of probation or supervised release. *United States v. Johnson*, 48 F.3d 806, 808 (4th Cir. 1995). Several courts have derived this limitation on probation officers' authority from the United States Sentencing Guidelines, *see* U.S.S.G. § 5B1.3(b) ("The *court* may impose other conditions of probation . . . ."); *United States v. Peterson*, 248 F.3d 79, 85 (2d Cir. 2001), but it is of constitutional dimension, deriving from Article III's grant of authority over "cases and controversies" to the courts, *see United States v. Meléndez-Santana*, 353 F.3d 93, 101

---

Office of Probation and Pretrial Services of the Administrative Office of the U.S. Courts, as of September 2004, a total of 10,216 post-conviction offenders received contracted mental health treatment services paid for by the Probation Office. The total mental health expenditures ran to $12,926,006, or some $1,265 per offender.

(1st Cir. 2003); *United States v. Bernardine*, 237 F.3d 1279, 1283 (11th Cir. 2001); *Kent*, 209 F.3d at 1078-79; *Johnson*, 48 F.3d at 808-09. In *United States v. Loy*, 237 F.3d 251, 265 (3d Cir. 2001), we struck down a delegation to a probation officer for a different constitutional reason, finding that a condition of supervised release that prevented the defendant from possessing pornography was void for vagueness because it gave Loy's probation officer the power to decide what materials met the definition of pornography.

To be sure, probation officers must be allowed some discretion in dealing with their charges; courts cannot be expected to map out every detail of a defendant's supervised release. The Second Circuit has reconciled these two imperatives, holding that:

> If [the defendant] is required to participate in a mental health intervention only if directed to do so by his probation officer, then this special condition constitutes an impermissible delegation of judicial authority to the probation officer. On the other hand, if the District Court was intending nothing more than to delegate to the probation officer the details with respect to the selection and schedule of the program, such delegation was proper.

*Peterson*, 248 F.3d at 85 (citations omitted). We agree with this statement of the standard, which properly balances the need for flexibility with the constitutional requirement that judges, not probation officers, set the terms of a defendant's sentence. Other courts are generally in accord with this view. *See United States v. Allen*, 312 F.3d 512, 515-16 (1st Cir. 2002) (adopting *Peterson* test and finding that a mental health condition was intended to be mandatory, with the administrative details delegated to the probation officer); *Kent*, 209 F.3d at 1078-79.

We apply the *Peterson* standard to this case. Here, the District Court thus gave Pruden's probation officer the authority to decide whether or not Pruden will have to participate in a mental health treatment program.[5] As this was an impermissible delegation

---

[5]It is theoretically possible to read the sentence, "The defendant shall participate in a mental health treatment program at the discretion of the probation officer," to mean that the probation officer shall have

14

of judicial authority, this aspect of the sentence was error.

## C. Plain Error

We have concluded that the District Court erred in imposing the mental health condition, and in delegating discretion to the probation officer. Given the wealth and unanimity of the precedents on these issues, we believe that the error was plain. A plainly erroneous condition of supervised release will inevitably affect substantial rights, as a defendant who fails to meet that condition will be subject to further incarceration. *Evans*, 155 F.3d at 252. Similarly, "imposing a sentence not authorized by law seriously affects the fairness, integrity, and reputation of the proceedings." *Id*. Thus, we are required to correct the plain error in this case by vacating this aspect of the sentence.

We repeat that this conclusion is no reflection on the "fairness, integrity, and reputation" of the District Court in this case. No one has questioned that the District Court's motivation in imposing the mental health condition was to help Pruden break the cycle of recidivism into which he seems to have fallen. Indeed, we are hesitant to thwart the District Court's attempt to rehabilitate Pruden, but we conclude that the law compels us to do so.

## IV. Conclusion

For the foregoing reasons, we affirm in part and reverse in part, and remand to the District Court with directions to vacate the mental health condition of Pruden's sentence.

---

discretion only to choose the particular program, but that participation in some such treatment program is mandatory. On this interpretation, the delegation would be permissible. The facts of this case, however—and, in particular, the lack of any specific findings that Pruden needs such mental health treatment—make it an implausible reading. At all events, the government conceded at oral argument that the District Court did not intend the probation officer's discretion to extend only to the choice of particular programs.