

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-15-2005

# USA v. Jackson

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-4555

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"USA v. Jackson" (2005). *2005 Decisions.* Paper 543.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/543

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No:  04-4555

UNITED STATES OF AMERICA

v.

KENDALL JACKSON,

Appellant

---

On Appeal from the United States District Court
for the Middle District of Pennsylvania
District Court Crim. No.: 3-CR-01-0401
District Judge: The Honorable Edwin M. Kosik

---

Submitted Pursuant to Third Circuit LAR 34.1(a)
September 15, 2005

Before: SLOVITER, BARRY, and SMITH, *Circuit Judges*

(Filed:    September 15, 2005 )

---

OPINION

---

SMITH, *Circuit Judge*.

Kendall Jackson was convicted of selling crack cocaine in four arranged buys to an

undercover police detective, and he was sentenced to 235 months' imprisonment.

Jackson raises nine issues related to the conduct of his trial, the District Court's refusal to

1

grant him a directed verdict or new trial, and to his sentence. The District Court had

jurisdiction pursuant to 18 U.S.C. § 3231; this Court's jurisdiction is under 18 U.S.C. §

3742(a) and 28 U.S.C. § 1291. We will affirm the District Court on the issues relevant to

Jackson's conviction, but will vacate the sentence and remand the case for resentencing in

accordance with *United States v. Booker*, 543 U.S. __, 125 S.Ct. 738 (2005). *United*

*States v. Davis*, 407 F.3d 162, 164-65 (3d Cir. 2005) (en banc).

The facts are well known to the parties, and we proceed directly to the analysis of

Jackson's claims.

**Conviction-Related Issues**

*Organizational Chart*

The first three issues Jackson raises all relate to the prosecution's use of an

organizational chart of a narcotics distribution conspiracy. Only one of these merits

discussion.[1] The District Court granted an acquittal to Jackson on the conspiracy count

because the main government witness for that charge could not positively identify

Jackson during the trial. Three co-defendants were convicted of conspiracy and other

offenses, whereas Jackson was convicted only of multiple counts of distribution and

---

[1] Regarding Issue #1 raised by Jackson, the District Court was well within its discretion in fashioning its jury instructions as it did, and based on our own review of the record, we agree that Jackson was not entitled to an instruction concerning the acquittal of the conspiracy charge. This instruction would have served no useful purpose, and may have confused the jury. Concerning Issue #3, the use of the organizational chart did not deny Jackson his Fifth Amendment right to a fair trial. The chart was not introduced as evidence, the District Court cautioned the jury not to treat it as such, and the display of the chart had no bearing on the charges presented to the jury.

possession with the intent to distribute crack cocaine. Jackson contends that his conviction and sentence should be vacated, and that he is entitled to a new trial because his conviction was tainted by the spillover effect of the evidence of conspiracy presented against his co-defendants.

In Jackson's view, the display of the conspiracy organizational chart showing Jackson as a member, when coupled with evidence that three of his co-defendants were indeed members of a conspiracy, had an impermissible spillover effect on the jury and likely prejudiced it against Jackson in relation to the substantive counts. The threshold question in spillover analysis is whether "any of the evidence used to prove the reversed count would have been inadmissible to prove the remaining count (*i.e.*, whether there was any spillover of inadmissible evidence)." *United States v. Gambone*, 314 F.3d 163, 181 (3d Cir. 2002). If the answer is "no," there is no prejudice, the analysis ends, and the defendant is out of luck. *Id.* If it is "yes," the error will be excused if it is "highly probable that the error did not prejudice the jury's verdict on the remaining counts." *Id.*

The evidence linking Jackson to the conspiracy was the sparse testimony of Michelle Kowalski, and she could not identify Jackson in court. But Jackson's main contention is that evidence of a conspiracy introduced against his co-defendants spilled over to his case. We are leery of the validity of Jackson's across-defendants spillover theory because in none of the cases on which Jackson relies has a court extended spillover effect analysis in this way, and we have not found any on our own. Be that as it may,

3

despite the government's arguments to the contrary, we can assume without deciding that Kawolski's testimony would not have been admissible to prove the substantive offenses, so Jackson satisfies the threshold inquiry.

However, it is "highly probable" that any spillover was indeed harmless. Jackson personally sold crack cocaine in three controlled purchases to Detective Noreen Hazen, and she testified that Jackson arranged a fourth purchase that James Ratliff completed with her. All of these transactions were corroborated by Lt. Fluegel, who conducted surveillance on the controlled purchases. The testimony of Hazen and Fluegel, and their identification of Jackson in court, was ample evidence on which the jury could rely to convict Jackson of four counts of possession and distribution of crack cocaine. Whatever slight spillover taint may have been associated with the inadmissible evidence paled into insignificance when compared to the evidence presented by Hazen and Fluegel.[2]

*Lapse Between* Miranda *Warnings and Interrogation*

---

[2] The danger of a spillover effect in conspiracy cases is more likely when the asserted spillover projects outward from the substantive to the inchoate, and less well or not at all in the reverse. In *Gambone*, for example, the defendants argued that evidence introduced on the substantive counts of personal tax evasion, on which the district court granted the defendants' motions of acquittal, tainted the jury regarding the inchoate conspiracy count. 314 F.3d at 181. This contention worked well in theory because the acquittal eliminated one of the underlying substantive crimes about which the Gambones were accused of conspiring, and thus undermined the inference that the prosecution asked the jury to draw on the conspiracy counts. The spillover theory weakens where, as here, acquittal of the inchoate count is claimed to have prejudiced the jury on the substantive offenses for which there is direct evidence. Such scenarios primarily ask juries to weigh the credibility of the evidence and do not demand that the jury make the inferential leap from the substantive to the inchoate. Because the jury here was not asked to extrapolate from the evidence and draw inferences about the defendants' alleged conspiratorial behavior, the danger of a spillover was small as an initial proposition.

Jackson contends that post-arrest statements he made to Monroe County authorities, and statements he made to an FBI investigator two weeks later, should be suppressed. Though Jackson concedes that he was *Mirandized* on each occasion, he avers that both statements were impermissibly elicited by police because the atmosphere surrounding each statement was coercive, and because in each case the statements were given one to two hours after his *Miranda* waiver.

To show the coerciveness of the Monroe County interrogation, Jackson notes that between his arrest/*Miranda* warnings and interrogation, he was placed on the ground, handcuffed, and driven to the magistrate's office under uniformed and armed guard during his arrest. He also contends that the atmosphere was coercive because he was fingerprinted and photographed during the same session as the interrogation, all of which occurred at the police station. Jackson's assertions of coerciveness regarding the FBI interrogation are similar – that he was shackled during questioning. However, Jackson adds that the FBI agents sought to intimidate him with remarks concerning potential mandatory sentences he faced and to entice him to speak by emphasizing the value cooperating might hold for him.

It is unremarkable that Jackson was transported by armed officers, placed in restraints, and processed with fingerprinting and mug shots while interviewed. These are quintessential trappings of custody recognized as inherently coercive by *Miranda* and subsequent cases. However, properly administered *Miranda* warnings are deemed to

5

dispel the greater part of that intrinsic coercion, and, as we have noted, that Jackson was validly informed of his rights and chose to waive them initially is not in question. *Rhode Island v. Innis*, 446 U.S. 291, 310 (1980) (Stevens, J., dissenting) ("In *Miranda* the Court required the now-familiar warnings to be given to suspects prior to custodial interrogation in order to dispel the atmosphere of coercion that necessarily accompanies such interrogations.").

Agent Wevodau testified, "Every Defendant I get [has] the opportunity to discuss mandatory minimums and cooperation, I spell it out as best I can." We do not believe that Agent Wevodau's discussion with Jackson of mandatory minimums and the potential benefit of cooperating implied a tit-for-tat bargain, a type of threat or empty bargain prohibited by *Miranda* that would cause Jackson to confess. *See United States v. Walton*, 10 F.3d 1024, 1029 (3d Cir. 1993) ("[T]he real issue is not whether a promise was made, but whether there was a causal connection between [the officer's] assurance and [the suspect's] statement."). Though Agent Wevodau was walking a fine line here, and was ill-advised in doing so, we do not think he crossed it.

Regarding the one-to-two-hour lapses between the *Miranda* warnings and Jackson's statements, our task is to ask whether the *Miranda* warnings were effective initially, and "whether the passage of time or other intervening event ... rendered the defendant unable to consider fully and properly the effect of an exercise or waiver of those rights before making a statement to law enforcement officers." *United States v.*

*Pruden*, 398 F.3d 241, 246-47 (3d Cir. 2005). The initial effectiveness of the warnings is not in question here, and neither the passage of time nor any intervening event undermined their validity. In *Pruden*, we commented that the twenty hour lapse between the warnings and the confession in that case seemed to approach the "upper end of the permissible range," *id.* at 247, and given the circumstances, the two one-to-two-hour lapses here are not cause for concern. Further, we are not nearly as impressed by the relatively minor intervening events highlighted by Jackson as we are by his criminal history, which includes four prior convictions, several terms of incarceration, and at least three parole revocations. From personal experience and not simply cop serials, Jackson is all too familiar with the content of the *Miranda* warnings, and the fact that he was *Mirandized* in one building and questioned in another did not change this familiarity. *See id.* at 246 (noting that a suspect's familiarity with his rights based on previous arrests is a factor suggesting the suspect comprehended the significance and continued validity of his waiver).

**Sentencing Issues**

The District Court sentenced Jackson on December 1, 2004, six weeks before the Supreme Court issued its *Booker* opinion. Jackson contends that in calculating his sentence the District Court improperly considered the 168 grams of crack cocaine Jackson admitted to buying and selling in his interview with FBI Agent Wevodau. Jackson argues that under *Booker* he should be sentenced based on the .94 gram of crack found beyond a

reasonable doubt by the jury, and that the District Court erred in considering the 168 grams to be relevant conduct.

The District Court stated that under the preponderance of the evidence standard:

> [W]e find, based on the evidence that we heard, that, clearly, at least, the Government has established that [Jackson] is implicated with 168 grams of cocaine [base], principally, based on the statement that, as [defense counsel] like[s] to say, allegedly, was given to Agent Wevodau, but which we believe was, indeed, given to Agent Wevodau and comes from the mouth of this Defendant –
>
> ...
>
> [Jackson] brought himself into the conspiracy with his own words to Agent Wevodau. Of course, if that is not considered relevant conduct, then, of course, we're wrong. But I believe it is appropriate and we're going to include it.

We believe this and the other sentencing issues raised by Jackson in light of *Booker* are best determined by the District Court in the first instance, and we will vacate the sentence and remand for resentencing in accordance with *Booker*. This result is not foreclosed by this Court's opinion in *United States v. Hill*, 411 F.3d 425 (3d Cir. 2005). Though we acknowledge that the District Court attempted to impose an alternative sentence in the event the *Blakely* rule was held applicable to the federal sentencing guidelines in the then-pending *Booker* case – a tack we validated in *Hill* – the District Court's alternative sentence lacked the clarity demanded by *Hill*. *See Hill*, 411 F.3d at 426 (concluding that "where, as here, a District Court clearly indicates that an alternative

8

sentence would be identical to the sentence imposed under the Guidelines, any error that may attach to a defendant's sentence under *Booker* is harmless"). Unlike in *Hill*, where the District Court was clear that it was imposing an alternate sentence under an indeterminate sentencing scheme that matched the Guidelines sentence, the District Court's judgment of sentence here was ambiguous. The District Court stated that it was "going to impose a discretionary sentence using the guidelines as advisory only, and what I deem to be appropriate." Yet, the District Court proceeded to sentence Jackson under a mandatory Guidelines regime, and never returned to state whether the alternate sentence would be different or the same. In these circumstances, we believe a *Davis* remand is the proper course to follow.