NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-4035
_____

UNITED STATES OF AMERICA

v.

MARCUS WHITE,
                                Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 10-cr-00420-001)
District Judge:  Honorable Petrese B. Tucker
_____

Submitted Under Third Circuit LAR 34.1(a)
November 15, 2012

Before:  SCIRICA, FISHER, and JORDAN, *Circuit Judges*.

(Filed: November 15, 2012)
_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Marcus White was convicted by a jury in the United States District Court for the

Eastern District of Pennsylvania for his involvement in the robberies of a post office and

two convenience stores.  Prior to trial, White filed a motion to suppress evidence obtained

during two separate warrantless searches of the vehicle he had been driving when he was

apprehended. He also filed motions to suppress statements he made during the course of his detention. He now appeals the District Court's denial of those motions. For the reasons that follow, we will affirm.

## I. Background

On June 2, 2010, White was driving a Kia minivan in Maryland. Trooper Andre Butler of the Maryland State Police ("MSP") was patrolling the area and received an alert from his license plate reader[1] indicating that the minivan was stolen. Butler contacted his radio dispatcher who confirmed that the vehicle had been reported stolen in Pennsylvania.

After pulling White over, Butler directed White, the only occupant of the minivan, to get out of the car. Butler handcuffed him and directed him to sit on the guardrail. Butler then conducted a brief search of the vehicle. On the center console he found a wallet containing a driver's license in the name of Tyrone Edwards. He asked White if he was Tyrone Edwards, and White said that he was.[2] Butler told White that the minivan had been reported stolen. Though he had not been asked anything, White responded that the minivan was not stolen but was a "rent-a-rock vehicle." (App. at 77.) Butler

---

[1] A license plate reader is a device that uses optical character recognition technology to read license plate numbers. Trooper Butler's reader was capable of processing license plate numbers in real time and providing an alert in the event a license plate number corresponded to a vehicle that had been reported stolen. At the suppression hearing, the District Court noted that "the technology utilized by the license [plate] reader is verifiable and acceptable technology." (App. at 166.) White does not challenge that conclusion.

[2] Trooper Butler mistakenly believed that the driver's license photograph was of White.

2

understood that statement to mean that White had borrowed the car in exchange for providing crack cocaine to its owner.

During the brief search of the minivan, Butler also found a locked box under the passenger seat. By shining his flashlight through two holes in the top of the box, Butler saw that the box contained a handgun. Using a key he found on the center console, he opened the box and found a .357 caliber Ruger Magnum and six live rounds of ammunition.

Butler took White to a nearby MSP barracks where White was read *Miranda* warnings. White signed a waiver of rights form, using the name "Tyrone Edwards." (App. at 76-78, 294; Supp. App. at 1.) Butler then asked him about the handgun. White replied that "there [was] more to the handgun than just the stolen vehicle," and that he did not intend to "tak[e] the whole rap." (App. at 78.) Butler reported White's statement to Sergeant Marc Black, who proceeded to interview White in Butler's presence, although he did not supply additional *Miranda* warnings to White. During that interview, White stated that he "had participated with others in an attempted kidnapping that involved a shooting in Philadelphia."[3] (App. at 31.)

Sergeant Rick Bachtell of the homicide unit of the MSP Criminal Investigation Division conducted a follow-up interview. White was again provided *Miranda* warnings, and he signed another waiver form, this time as "Tyrone Edward," dropping the "s" from

___

[3] Neither that remark nor the statement that White made to Trooper Butler that he would not "tak[e] the whole rap" was introduced at trial. White argues, however, that those statements led to incriminating statements to Sergeant Bachtell. He accordingly argues that the ensuing investigation is tainted by what he contends was wrongful interrogation.

3

the last name. (App. at 43, 102-04, 298-301.) During the interview, White said that the gun had been used in a shooting incident at a restaurant in Philadelphia and that he was transporting it to Virginia. Although he claimed that he had been in New York for the three days preceding his arrest, he was unable to provide details of his activities. He was also evasive about his age and date of birth.

Following the interview, Bachtell obtained from the owner of the minivan consent to search the vehicle again. On the front seat, he found a green backpack containing Pennsylvania Board of Probation and Parole paperwork in the name of Marcus White. He also found a red plastic store bag containing approximately 1,150 unissued money orders from the United States Postal Service and approximately 65 unissued Western Union money orders from a Turkey Hill convenience store in Lower Pottsgrove Township, Pennsylvania. Bachtell telephoned the Turkey Hill security department and was told of two incidents on June 1, 2010, one a failed attempt to rob money orders from a Coatesville, Pennsylvania store, and the other a successful robbery of money orders from the Lower Pottsgrove store. During the second robbery, a 74-year old store clerk was shot twice in the leg with a .38 caliber handgun. Bachtell also contacted the Lower Pottsgrove Township Police Department and was told that on May 27, 2010, the U.S. post office in Limerick, Pennsylvania had been robbed. During that robbery, cash and a large number of unissued U.S. postal money orders were stolen.

Because of the stolen money orders, FBI Special Agent Gregory Banis, U.S. Postal Inspector Michael Marro, and Lieutenant Michael Foltz of the Lower Pottsgrove Township Police Department came to the MSP barracks to interview White on June 3,

4

2010. White again waived his *Miranda* rights by signing a waiver form, this time in the name of "Marcus White." (App. at 122-24, 338-39; Supp. App. at 3.) He proceeded to admit that he had robbed the Limerick post office and the two Turkey Hill stores. He also admitted to shooting the employee at the Lower Pottsgrove store.

White was charged with one count of conspiracy, in violation of 18 U.S.C. § 371; one count of conspiracy to commit robbery interfering with interstate commerce, in violation of 18 U.S.C. § 1951(a) (the "Hobbs Act"); one count of robbery of a postal employee, in violation of 18 U.S.C. § 2114(a); one count of Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a); one count of attempted Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a); three counts of carrying and using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c); and two counts of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g).

Prior to trial, White filed a motion to suppress physical evidence and two motions to suppress statements. The District Court denied the motions after an evidentiary hearing. The jury found White guilty on all counts, after which the Court sentenced him to 804 months in prison, five years of supervised release, and a special assessment of $1,000. White filed a timely notice of appeal.

## II.    Discussion[4]

On appeal, White challenges the District Court's denial of his suppression motions.  First, he argues that, having handcuffed him and moved him to the guardrail, Trooper Butler lacked authority to search the minivan.  He also argues that Sergeant Bachtell lacked authority to open his backpack and the red plastic bag, notwithstanding the permission given by the owner of the minivan to search the vehicle a second time.  Finally, White contends that the District Court should have suppressed certain of his incriminating statements because he had not received appropriate *Miranda* warnings.

### A.    *The Searches of the Minivan*

White says that each search of the minivan, the first by Trooper Butler and the second by Sergeant Bachtell, violated his constitutional rights.  He claims that he possessed a legitimate expectation of privacy in the contents of the locked document box, the closed backpack, and the red plastic store bag.  Accordingly, he asserts, the contents of each container should have been suppressed, as well as all subsequent fruits of the investigation based on the contents of those containers.

We reject those arguments because White lacks standing to challenge the search of the minivan.  A person has no legitimate expectation of privacy in a place where he has no right to be.  In *Rakas v. Illinois*, the Supreme Court stated:

---

[4] The District Court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.  "This Court reviews the District Court's denial of a motion to suppress for clear error as to the underlying factual findings and exercises plenary review of the District Court's application of the law to those facts." *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002).

> [A] "legitimate" expectation of privacy by definition means more than a subjective expectation of not being discovered. A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as "legitimate." His presence … is "wrongful"; his expectation is not one that society is prepared to recognize as "reasonable."

439 U.S. 128, 143 n.12 (1978) (citations and internal quotation marks omitted).

In this case, White challenges the search of a van that he did not own and that had been stolen from its rightful owner. Although we have not previously addressed the right of a defendant to challenge the search of a stolen car, we have held that "the driver of a rental car who has been lent the car by the renter, but who is not listed on the rental agreement as an authorized driver, lacks a legitimate expectation of privacy in the car unless there exist extraordinary circumstances suggesting an expectation of privacy." *United States v. Kennedy*, 638 F.3d 159, 165 (3d Cir. 2011). And we added that no such expectation of privacy exists where the individual "borrows [the] rental car without the permission or knowledge of the owner." *Id.*; *see also United States v. Jones*, 430 F. Supp. 219, 224 (W.D. Pa. 1977) (holding that defendant "had no standing to contest the search of [his companion's] trunk and the laundry bag" contained therein), *aff'd without op.*, 591 F.2d 1337 (3d Cir. 1979) (unpublished table opinion).

Although we have not reached the question before, it is hardly surprising that several other courts have held that the possessor of a stolen vehicle lacks standing to challenge a search of the vehicle. *See United States v. Tropiano*, 50 F.3d 157, 161 (2d Cir. 1995) ("[I]t [is] obvious that a defendant who knowingly possesses a stolen car has

7

no legitimate expectation of privacy in the car."); *United States v. Lanford*, 838 F.2d 1351, 1353 (5th Cir. 1988) (the possessor of a stolen vehicle has no standing to object to its search); *United States v. Hensel*, 672 F.2d 578, 579 (6th Cir. 1982) (per curiam) ("[T]he defendant lacked standing to challenge the search of the truck because he had no legitimate expectation of privacy in the stolen vehicle or its contents."); *United States v. Sanchez*, 635 F.2d 47, 64 (2d Cir. 1980) (defendant who did not show either that he owned the car or possessed it with permission of the owner lacked constitutionally protected interest in car). We likewise reject White's claim that he had a legitimate right of privacy in the contents of the stolen minivan, and so we hold that he had no standing to object to the search of the car,[5] *see Rakas*, 439 U.S. at 143 n.12 (stating that where an individual's "presence … is 'wrongful[,]' his expectation [of privacy] is not one that society is prepared to recognize as 'reasonable'"), or its contents, *see United States v. Wellons*, 32 F.3d 117, 119 (4th Cir. 1994) ("One who can assert no legitimate claim to the car he was driving cannot reasonably assert an expectation of privacy in a bag found in that automobile. … A person who cannot assert a legitimate claim to a vehicle cannot reasonably expect that the vehicle is a private repository for his personal effects, whether

---

[5] Even if White had standing, however, his assertion that the officers lacked authority to search would fail. Because Trooper Butler had probable cause to believe the vehicle was stolen, he had probable cause to search it for evidence relating to the theft, including in the box, the backpack, and the plastic store bag. *See United States v. Ross*, 456 U.S. 798, 824 (1982) (holding that if police have probable cause to search any part of a vehicle, they may search all compartments, containers, and packages within that portion of the vehicle that may contain the item sought because "[t]he scope of a warrantless search of an automobile … is not defined by the nature of the container in which the contraband is secreted[, but] … by the object of the search and the places in which there is probable cause to believe that it may be found").

8

or not they are enclosed in some sort of a container, [including personal luggage]." (internal quotation marks omitted)).

The District Court therefore did not err in denying White's motion to suppress the evidence discovered during the searches of the minivan.

B.   *White's Incriminating Statements*

White also contends that the District Court should have suppressed all of his incriminating statements.  He argues that his statement that the minivan was a "rent-a-rock" vehicle should have been suppressed because it was made before he received any *Miranda* warnings, and that all subsequent investigation should be suppressed as "fruit of the poisonous tree."  *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (employing "fruit of the poisonous tree" label for evidence tainted by illegal search or seizure).  In addition, White says that the record contains only one "*Miranda* card," or signed waiver form, which corresponds to the follow-up interview conducted by Sergeant Rick Bachtell.  (Appellant's Br. at 31-32.)  According to White, there is no evidence that he was given *Miranda* warnings prior to his interrogation by Sergeant Black, during which he made incriminating statements about a shooting in Pennsylvania.  He contends, therefore, that those statements should also be suppressed, and that any statements that followed in the second interview should have been suppressed as additional fruit of the poisonous tree.

The record belies those *Miranda* arguments.  First, White's "rent-a-rock" statement was volunteered; it was not given in response to questioning.  At the suppression hearing, Trooper Butler testified that while White was sitting on the

9

guardrail, he told him that the reason for the stop was that the vehicle had been reported stolen. According to Butler, White then blurted out that "the vehicle is not stolen and that it's a rent-a-rock vehicle." (App. at 76-77.) Under those circumstances, no *Miranda* violation occurred. *Miranda* warnings are required only when a suspect is both in custody and subject to interrogation. *Alston v. Redman*, 34 F.3d 1237, 1246-47 (3d Cir. 1994). Informing a suspect of the reason for his arrest, as Trooper Butler did when he informed White that the minivan had been reported stolen, does not constitute interrogation for purposes of *Miranda*. *See United States v. Benton*, 996 F.2d 642, 643 (3d Cir. 1993) (explanation of why defendant was arrested is not the "functional equivalent of interrogation" because it is not "reasonably likely to elicit an incriminating response" (emphasis and internal quotation marks omitted). Accordingly, the District Court did not err in denying White's motion to suppress his statement that the van was a "rent-a-rock" vehicle.

Second, the uncontroverted evidence at the suppression hearing showed that White, prior to his interrogation by Sergeant Black, was advised of his *Miranda* rights and agreed to waive them.[6] Trooper Butler testified that White received *Miranda* warnings when he was initially processed at the MSP barracks. The advice of rights form

---

[6] Indeed, the record contains three *Miranda* waiver forms, not just one as White asserts. White signed a waiver form in the name of "Tyrone Edwards" when he was first processed at the MSP barracks. (App. at 76-78, 294; Supp. App. at 1.) He signed another one as "Tyrone Edward" before his interview with Sergeant Bachtell. (App. at 43, 102-04, 298-301.) And he signed one in his own name, "Marcus White," before he was interviewed by officers from the FBI, the U.S. postal inspector's office, and the Lower Pottsgrove Township Police Department. (App. at 122-24, 338-39; Supp. App. at 3.)

10

which White signed as "Tyrone Edwards" was introduced into evidence at the hearing. After White signed the waiver, Trooper Butler asked him about the handgun, and White said that "there is more to the handgun than just the stolen vehicle. I am not taking the whole rap." (App. at 78.) Butler then told Sergeant Black what White had said, and Sergeant Black conducted a formal interview of White during which White made an incriminating statement about a shooting at a Philadelphia restaurant. Butler was present during the interview.

It is true that Sergeant Black did not advise White of his *Miranda* rights a second time, but there was no need for him to do so. White had just signed an advice of rights form, using a false name. "*Miranda* … does not necessarily require that a suspect be warned anew each time he is questioned." *United States v. Pruden*, 398 F.3d 241, 246 (3d Cir. 2005). Rather, White's original *Miranda* waiver remained in full effect as long as nothing "occur[ed] between the warnings and the statement, whether the passage of time or other intervening event, which rendered the defendant unable to consider fully and properly the effect of an exercise or waiver of those rights before making a statement to law enforcement officers." *Id.* at 246-47 (internal quotation marks omitted). It does not appear from the evidence that any significant amount of time passed before Sergeant Black joined Trooper Butler in questioning White. Nor does it appear that anything occurred that would have rendered White's waiver of rights ineffective. Accordingly, the District Court did not err when it denied White's motion to suppress his statements.

## III. Conclusion

For the above reasons, we will affirm the judgment of the District Court.